AO 91 (REV.5/85) Criminal Complaint

AUSAS THOMAS D. SHAKESHAFT (312) 886-0667
LINDSAY JENKINS (312) 353-0962

# UNITED STATES DISTRICT COURT

FILED
JUL 16 2008
JUL 16 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

_____NORTHERN_____ DISTRICT OF ____ILLINOIS, EASTERN DIVISION N:__

UNITED STATES OF AMERICA

v.

MICHAEL KING
CLAUDE MCKAY III

**08 CR    561**

CASE NUMBER:

## MAGISTRATE JUDGE DENLOW

I, the undersigned complainant being duly sworn state the following is true and correct
to the best of my knowledge and belief:

From in or about <u>March 2007 to in or about July 2008</u>, in <u>Chicago and elsewhere,</u> in the
<u>Northern</u> District of <u>Illinois</u>, defendants MICHAEL KING and CLAUDE MCKAY did conspire with
each other and with others to knowingly and intentionally possess with intent to distribute
a controlled substance, namely, mixtures containing one kilogram or more of heroin, a
Schedule I Controlled Substance, and mixtures containing 5 kilograms or more of cocaine, a
Schedule II Controlled Substance;

In violation of Title _21_, United States Code, Section _846_.

I further state that I am a <u>Special Agent, Drug Enforcement Administration</u>, and that this
complaint is based on the following facts:

Please see attached affidavit.

Continued on the attached sheet and made a part hereof:  _X_ Yes ___ No

Eric Durante, Special Agent, DEA
Signature of Complainant

Sworn to before me and subscribed in my presence,

<u>July 16, 2008</u>          at  <u>Chicago, Illinois</u>
Date                          City and State

<u>Morton Denlow, Magistrate Judge</u>
Name & Title of Judicial Officer          Signature of Judicial Officer

COUNTY OF COOK    )                    **UNDER SEAL**
                  )     SS
STATE OF ILLINOIS )

**AFFIDAVIT**

I, Eric Durante, being first duly sworn, state the following:

## I.    INTRODUCTION

1.    I am a Special Agent with the Drug Enforcement Administration ("DEA"), United States Department of Justice. I have been so employed by the DEA since January 2004, and I am currently assigned to the DEA High Intensity Drug Trafficking Area ("HIDTA") gang task force in Chicago, Illinois. My official DEA duties include investigating criminal violations of the federal narcotics laws, including, but not limited to, Title 21, United States Code, Sections 841, 843 and 846.   I have received specialized training in the enforcement of laws concerning controlled substances as found in Title 21 of the United States Code, including but is not limited to classroom instruction concerning narcotics trafficking and money laundering.  I have participated in numerous complex investigations of drug trafficking organizations.  I have been involved in various types of electronic surveillance (including the interception of wire communications pursuant to Title III), the debriefing of defendants, witnesses and informants, as well as others who have knowledge of the

distribution and transportation of controlled substances and of the laundering and concealing of proceeds from drug trafficking.

2. Through these investigations, my training and experience, and conversations with other law enforcement officers, I have become familiar with the methods used by narcotics traffickers to safeguard and distribute narcotics and to collect and launder narcotics proceeds. For example, I am familiar with their use of prepaid cellular phones, normal land line phones, public phones, debit calling cards, counter-surveillance, the use of false and/or fictitious identities, and the use of coded language during conversations when referring to narcotics in an attempt to disguise the true meaning of the conversation. I also know that consensually monitored telephone calls, as well as court authorized intercepts, often provide valuable evidence of conspiracy pertaining to narcotics trafficking activities.

3. This Affidavit is submitted in support of a Criminal Complaint alleging the participation of two individuals, identified below, in an extensive drug trafficking organization, and the issuance of arrest warrants for those defendants, as well as the issuance of search warrants for certain locations identified by law enforcement as being associated with these individuals' narcotics trafficking, and a seizure warrant for a vehicle used to facilitate

narcotics trafficking. These individuals, their narcotics-trafficking activities, and the locations used to traffic narcotics, are described in detail below.

4.     On the basis of the information contained in this Affidavit, and my training and experience, I allege that there is probable cause to believe that between about February 2007 and the present, MICHAEL KING a/k/a "Big Mike" and "Fat Mike" ("KING"),; and CLAUDE MCKAY III a/k/a "Rodney" and "Rod," ("MCKAY") conspired with each other and with others, to knowingly and intentionally distribute and possess with the intent to distribute controlled substances, namely, mixtures containing one kilogram or more of heroin, a Schedule I Narcotic Drug Controlled substance and mixtures containing five kilograms or more of cocaine, a Schedule II Narcotic Drug Controlled substance, in violation of Title 21, United States Code, Section 846.

5.     This case is being investigated by agents of the DEA, the Federal Bureau of Investigation ("FBI"), the Internal Revenue Service ("IRS"), the Chicago Police Department ("CPD") and the Cook County State's Attorney's Office. The statements contained in this Affidavit are based in part on: (a) my personal participation in this investigation; (b) information provided by Special Agents of the DEA, FBI, and IRS, officers of the CPD, investigators of the Cook County State's Attorney's Office, intelligence analysts of the DEA, and other law enforcement agents; (c) information provided by cooperating sources and

cooperating defendants; (d) analysis of pen register and trap and trace data; (e) review of consensually-recorded conversations and conversations intercepted pursuant to court order; (f) the training and experience of myself and other law enforcement agents, and (g) my review of laboratory analysis reports, intelligence reports of telephone records, pen register and trap and trace analyses, and criminal history records maintained by CPD, Illinois State Police, and the National Crime Information Center.

6.    Because this Affidavit is submitted for the limited purpose of establishing probable cause to support the Criminal Complaint and the issuance of search warrants for the locations identified below, it contains only a summary of relevant facts.   I have not included each and every fact known to me concerning the entities, individuals, and events described in this Affidavit.

7.    The summaries of consensually-recorded and intercepted conversations contained in this Affidavit are based on draft, not final transcripts. In most cases, voice identifications are based on names used during the intercepted conversations, voice recognition that has been accomplished to date by law enforcement officers, historical information developed during this investigation, and/or telephone subscriber information. At various points in this Affidavit, I have included my understanding of words and phrases used in consensually-recorded and intercepted conversations.   My understanding is

based on the contents and context of the conversations, my knowledge of the investigation as a whole, and my training and experience as a DEA Special Agent. The summaries of consensually-recorded and intercepted conversations do not include references to all of the topics covered during the course of the conversations that were intercepted or recorded. In addition, the summaries do not include references to all statements made by the speakers on the topics that are described.

## II.   OVERVIEW

8.    This investigation has focused on KING and his drug-trafficking operation (the "KING DTO"). The KING DTO imports wholesale quantities of cocaine from Mexican sources of supply and distributes multi-kilogram quantities of cocaine and heroin to purchasers in Chicago and Kentucky. The investigation to date has revealed that the members of the KING DTO include KING, MCKAY, and others.   Several cooperating sources ("CSs") and cooperating defendants ("CDs") have indicated that beginning no later than 1999, the KING DTO supplied wholesale quantities of cocaine to individuals in the Lexington, Kentucky area. As described in detail below, the CSs have described that the KING DTO takes possession of large quantities of cocaine in the greater Chicago, Illinois area from Mexican sources of supply, and in turn transports these wholesale quantities of cocaine from Chicago to Kentucky and

other areas, for further distribution. Additionally, from approximately July through December 2007, the KING DTO supplied wholesale quantities of cocaine and heroin to other DTOs for distribution in the greater Chicago area.

9.    The investigation to date has included court-authorized interception of wire communications over three target telephones: **Target Phone 1; Target Phone 2;** and **Target Phone 7.**

III.    **Summary of Probable Cause**

A.    **Typical Distribution Pattern of the King DTO.**

10.    As outlined below, KING obtained wholesale quantities of cocaine and heroin in Chicago, Illinois from Mexican sources of supply.  Once KING learned from the Mexican sources of supply that a supply of cocaine was in Chicago, he typically contacted his customers, including CS4 and Individual A, to come to Chicago to pick up the cocaine.  Upon arrival of the customer, KING directed them to a high rise parking garage in the downtown area of Chicago. Once at the garage, KING made arrangements with the Mexican sources of supply to have the cocaine delivered to his customers.  A short time later KING arranged for the meeting, a narcotic "transporter" working for the Mexican sources of supply met with KING's customer.  At the meeting, KING's customer obtained wholesale quantities of cocaine from the Mexican sources of supply's

transporter.  Both the narcotics customer and the narcotics transporter used vehicles with hidden compartments in them to transport the cocaine.

11.    Once KING's customer had possession of the cocaine, the customer transported it out of Illinois, mainly to Lexington, Kentucky.  After the customer sold the cocaine, the cash generated by the sale of the cocaine ("narcotics proceeds") was transported by the original customer, or a co-conspirator of the customer, to Chicago.  Typically, once in Chicago, the customer contacted KING and they arranged a meeting.  At the meeting, KING took his share of the narcotics proceeds of the total obtained from selling the cocaine.  KING then proceeded to contact the Mexican sources of supply to inform them that their share of the narcotics proceeds were in Chicago. At this time, KING advised his customer to take the narcotics proceeds to an arranged meet location, usually the same one where the narcotics were originally obtained.  Once at the meeting location, KING's customer typically met with the same "transporter."  During the meeting, KING's customer provided the "transporter" with the narcotics proceeds. The "transporter" then typically supplied KING's customer with more cocaine.

12.    KING also supplied wholesale quantities of cocaine and heroin to MCKAY.  MCKAY then sold the narcotics to other DTOs within the greater Chicago area.  MCKAY took his share of the narcotics proceeds from the total

7

obtained from selling the narcotics.   MCKAY then subsequently gave the remaining narcotics proceeds to KING and KING gave MCKAY more narcotics. KING proceeded to take his narcotics proceeds from the total obtained by MCKAY and gave the rest back to a "transporter" working for KING's Mexican sources of supply.

**B.    Summary of Seizures of Narcotics and Narcotics Proceeds.**

13.    From approximately May  2007 through May 2008, as described below, narcotics and narcotics proceeds have been seized from members of the KING DTO. These seizures included:

> i.    May 26 and 27, 2008, a seizure of approximately 8 kilograms of cocaine and approximately $16,931 in U.S. currency in Chicago, Illinois.
>
> ii.    February 22, 2008, a seizure of approximately 8 kilograms of cocaine and approximately $1,131,635 in U.S. Currency in Lexington, Kentucky, from CD3.
>
> iii.    February 18, 2008, a seizure of approximately 5 kilograms of cocaine in Lexington, Kentucy, from CD3.
>
> iv.    February 8, 2008, a seizure of approximately 25 grams of crack cocaine in Chicago, from Individual S.
>
> v.    November 30, 2008, a seizure of approximately 41.3 grams of heroin in Chicago, from MCKAY, Individual GG, and Individual HH.
>
> vi.    November 27, 2008, a seizure of approximately 399.6 grams of heroin in Chicago, from Individual FF.

D.    Locations to Be Searched and Probable Cause Supporting Each.

14.    The following is list of locations used by members of the KING DTO

for which probable cause exists to believe they contain evidence of the

commission of violations of Title 21, United States Code, Section 846:

      a.    **175 Willow Boulevard, Willow Springs, Illinois;** this is
          KING's principal residence.

      b.    **33 West Ontario, Condominium 42EN, Chicago, Illinois;** this
          is KING'S other residence.

      c.    **924 East Hyde Park Boulevard Unit 2W, Chicago, Illinois;**
          this is MCKAY'S principal residence.

IV.    FACTS ESTABLISHING PROBABLE CAUSE

A.    Confidential Source and Confidential Defendant Historical
     Information Regarding the KING DTO.

    1.    <u>Confidential Source - 4</u>

15.    CS4 has provided significant historical information related to the

KING DTOs narcotics trafficking, and his/her involvement with that narcotics

trafficking over a almost a decade.  This information has been corroborated in

significant respects by consensually-recorded conversations that CS4 has had

with KING and other members of the KING DTO after CS4 began cooperating

with law enforcement, telephone toll records, and physical surveillance.

16.    CS4 was interviewed by law enforcement in February 2008 and

related that CS4 has transported kilogram qualities of cocaine from Chicago,

Illinois to Lexington, Kentucky for KING since 1999.[1] CS4 related that from

1999 to 2008, he/she has purchased between 3 and 30 kilograms of cocaine

weekly from KING. CS4 related that he/she purchased all the kilograms of

cocaine from KING in Chicago, Illinois and then he/she would transport them

himself/herself or would have a worker transport them to Lexington, Kentucky.

CS4 related that he/she would then sell the cocaine to customers in Lexington,

Kentucky; two of the customers are listed below as CS5 and CD3. CS4 related

that KING was charging him/her between $19,500 to $23,000 per kilogram of

cocaine. CS4 related that he/she purchased a majority of the cocaine from KING

for $22,000 a kilogram.

17.    CS4 related that in 1999, CS4 met KING while selling cocaine in the

housing projects in Lexington, Kentucky.[2] CS4 related that CS4 was introduced

---

[1] Beginning in February 2008, CS4 began cooperating with DEA.. CS4's basis of knowledge consists of CS4 personally transporting narcotics and narcotics proceeds for KING from 1999 to 2008. CS4 has not been paid for his/her cooperation in this investigation and is cooperating in exchange for sentencing recommendations by the government relating to previous narcotics transactions conducted by CS4 with KING and other members of the KING DTO, for which CS4 expects to be charged. CS4 has not been promised any specific consideration for his cooperation. CS4's criminal history consists of approximately 2 arrests for possession of marijuana and driving on a suspended license. CS4 was convicted of possession of marijuana in Fayette County, Kentucky and was ordered to pay a fine.

[2] The identity of KING was established by, among other things, the following: CS4 identified KING's voice while talking to him; CS4 has known KING since 1999; CS1 previously identified KING's voice on other intercepted wire communications that

to KING by Individual A. CS4 related that after meeting KING, CS4 began purchasing 3 to 5 kilograms of cocaine a week from Individual A. CS4 related that CS4 purchased cocaine from Individual A, who in turn was supplied by KING. CS4 related that shortly thereafter he/she started purchasing cocaine directly from KING.

18.    CS4 related that in the summer of 1999, KING transported 25 kilograms of cocaine to CS4 in Lexington, Kentucky. CS4 related that KING told CS4 that he utilized a Dodge Intrepid, equipped with a trap compartment in the back seat, to transport the 25 kilograms of cocaine to Kentucky. CS4 related that KING would "front" the cocaine to CS4 and that CS4 would send the money back to Chicago, Illinois, utilizing a vehicle equipped with a trap compartment. CS4 related that after KING transported the 25 kilograms to Kentucky, KING never returned. CS4 related that KING started to utilize Individual K and other drivers to transport the cocaine from Illinois to Kentucky. CS4 related that the cocaine was always transported in vehicles that had concealed compartments in them. CS4 related that the currency was always transported back to Chicago in the same vehicles inside the concealed compartment.

---

occurred between KING and Individual GG; agents identified the voice of KING on the recorded call between CS4 and KING as the same voice as the intercepted wire communications that CS1 identified between KING and Individual GG.

11

19    CS4 related that in 1999, Individual A and CS4 purchased a Ford Thunderbird that had a concealed compartment in the rear speakers of the vehicle.    CS4 related that they shared the car and they both stored and transported money in the vehicle's concealed compartment.  CS4 related that Individual A purchased cocaine directly from KING until May 18, 2007, when Individual A was arrested by DEA agents in Kentucky.

20.    CS4 related that in 2000 and 2001, CS4 purchased 3 to 5 kilograms of cocaine a week from KING.  CS4 related that since 1999, he/she has only purchased cocaine from KING.

21.    CS4 related that in 2002, KING sent Individual K to Kentucky with 3 kilograms of cocaine.  CS4 related that after receiving the 3 kilograms of cocaine, CS4 gave Individual K approximately $64,000 to transport to KING in Chicago.  CS4 related that while Individual K was driving back to Chicago, he got stopped by the Indiana State Police.  CS4 related that during the traffic stop the police discovered the concealed compartment and seized the $64,000.

22.    CS4 related that in late 2003, KING sent Individual K to Lexington, Kentucky with 7 kilograms of cocaine for CS4.  CS4 related that Individual K was driving a green conversion van equipped with a concealed compartment in the ceiling of the van.  CS4 related that after receiving the seven kilograms of cocaine, he/she gave Individual K $150,000 in currency.  CS4 related that

12

Individual K subsequently left Kentucky and started driving towards Illinois. CS4 related that later that day KING called him/her and told CS4 that Individual K was robbed.  KING related to CS4 that Individual K stated he stopped in a rest stop in an unknown location in Indiana and was subsequently car jacked.[3]

23.    CS4 related that after Individual K lost the $150,000, CS4 started transporting the cocaine and the currency back and forth from Illinois to Kentucky himself/herself with a Ford Explorer.  CS4 related that he/she purchased a Ford Explorer equipped with a concealed compartment from KING. CS4 related that the concealed compartment in the Explorer was located under the driver's seat and could hold five kilograms of cocaine.

24.    CS4 related that when the kilograms of cocaine were ready to be picked up, KING would call CS4 and tell him, "Shit ready." CS4 related that KING would call him and would direct CS4 to meet a Hispanic male in a number of different parking garages located in and around downtown Chicago.  CS4

---

[3]On or about February 28, 2008, at approximately 7:32 p.m., CS4 received an incoming call from KING.  During the call, CS4 asked, "They ain't never found that van [Individual K] got car jacked in did they?" KING stated, "Huh?" CS4 asked, "They ain't never found that van [Individual K] got car jacked in?" KING stated, "Na they ain't nothing. He probably did something stupid man, I don't know what the fuck he did.  Damn I lost so much money on the fucken' road" [meaning over time the police have seized large sums of narcotics proceeds from members of the KING DTO, while the proceeds were in transport back to Illinois]. CS4 stated, "He ain't do nothing to steal that money because the man ain't never came up with no $150,000 dollars."  KING stated, "Na he ain't did that."

related that he/she recently started using a new parking garage at 8th and State Streets, Chicago, Illinois. CS4 related that they started using this garage to conduct the narcotics transactions because payment is not required at the garage upon entry.

25.     CS4 related that KING would always have CS4 arrive at the parking garage first. CS4 related that when he/she arrived at the garage, he/she would call KING on the phone and advise him that he/she was there. CS4 related that KING would hang up with CS4 and then contact one of his narcotics sources of supply. CS4 related that the narcotics supplier would then call their driver and advise him to deliver the kilograms of cocaine to CS4 at the parking garage. CS4 related that after KING talked to his narcotics supplier, he would call CS4 and advise him/her that the supplier told him that the cocaine was on the way.

26.     CS4 related that during the nine ('99-'08) years of purchasing cocaine from KING,  he/she has picked up cocaine on numerous occasions at these parking garages. CS4 related that he/she would always pick up cocaine from Hispanic males. CS4 related that the subjects he/she picked up cocaine from all work for KING's narcotics supplier.

27.     CS4 related that  in 2003, KING owned a single family residence located at 4741 West 186th Place, Country Club Hills, Illinois. CS4 related that in 2003, he/she had a room in the house where he/she would stay while in

14

Chicago. CS4 related that in 2003 and 2004, he/she knew that KING owned three residences in the Chicago area, specifically, residences located at: (a) 4741 West 186th Place, Country Club Hills; (b) 3727 West 79th Place, Chicago, Illinois; and (c) 114th and Princeton, Chicago, Illinois. CS4 related that the house on 114th Street was utilized as a "stash house" that was equipped with a wall safe located in the basement by the washer/dryer.

28.    CS4 related that in about the summer of 2004, Individual K left KING's residence at 4741 West 186 Place, Country Club Hills in the Dodge Intrepid with 7 kilograms of cocaine stored inside the concealed compartment. CS4 related that at this time, Individual K was delivering the 7 kilograms of cocaine to him/her. CS4 related that approximately five minutes after Individual K left KING's residence, the police executed a search warrant on the residence. CS4 related that during the search warrant, the police did not recover any narcotics in the residence. CS4 further related that the police missed a concealed compartment installed inside the wall of the garage at belly height and behind a metal bracket.[4] CS4 related that at the time the police conducted

---

[4]On April 22, 2008, DEA Agents conducted a consent search of 4741 West 186th Place, Country Club Hills, Illinois. During the search, agents located the concealed compartment in the wall behind a metal bracket shelf unit. The compartment was installed with an after market outlet box that provided power to the inside of the compartment. Based on my training and experience, power is needed to activate an opening or door of a concealed compartment.

the search warrant in 2004 there were 8 kilograms of cocaine in the compartment.

29.    CS4 related that in 2004, KING wanted to purchase a larger residence. CS4 related that KING sold the house at 4741 West 186th Place, Country Club Hills, Illinois to his narcotics suppliers.

30.    CS4 related that in about the summer of 2005, KING was selling CS4 approximately 60 to 80 kilograms of cocaine a month. CS4 related that KING was storing the kilograms at his house at 3727 West 79th Place, Chicago, Illinois.

31.    CS4 related that in about 2005, CD3 started working for him/her. CS4 related that CD3 started to find customers for the cocaine in Lexington, Kentucky. CS4 related that CD3 started to sell cocaine for him/her. CS4 related that he/she was doing well selling cocaine in Kentucky and most of the success was attributed to the fact that he/she was packaging the cocaine himself/herself. CS4 related that in approximately 2005, KING taught him/her how to "press," (i.e., package) the kilograms of cocaine himself.

32.    CS4 related that in about 2006, people who were connected to his/her operation in Kentucky were arrested, including CD3 and CS5. CS4 related that at this time, he/she was ordering 15 kilograms of cocaine a week

from KING. CS4 related that he/she would keep 4 kilograms for himself/herself and the other 11 he/she would give to CD3 to sell .

33.    CS4 related that in about March of 2007, he/she moved to Chicago. CS4 related that during this time, he/she stopped transporting cocaine himself/herself. CS4 related that in 2007, he/she recruited CS5 to transport cocaine from Chicago to Kentucky. CS4 related that after CS5 arrived in Kentucky with the cocaine, CS5 would give it to CD3. CS4 related that CD3 would sell the kilograms of cocaine in Kentucky, then give the proceeds to CS5. CS5 would subsequently transport the proceeds back to CS4 and KING.

34.    CS4 related that in about early 2007, KING told CS4 that he began to supply MCKAY with wholesale quantities of heroin and cocaine. CS4 related that KING said he was purchasing between 2 and 3 kilograms of heroin at a time. CS4 related that MCKAY is KING's only known heroin purchaser and that KING supplied MCKAY with all his kilograms of heroin. CS4 related that KING also said he fronted MCKAY with wholesale quantities of cocaine.

35.    CS4 related that shortly after KING moved into the town home at 175 Willow Boulevard, Willow Springs, CS4 was invited by KING inside the residence. CS4 related that while inside the town home, he/she saw Individual L there working in the basement. At this time, CS4 related that he/she observed Individual L finish the drywall around a concealed compartment in the wall.

17

CS4 related that the compartment is located in the wall next to the furnace and hot water heater.  CS4 related that the opening is at shin level and that it is controlled by a remote control. CS4 related that he/she believes KING stores some of his narcotics proceeds in this compartment.

36.    CS4 related that on February 1, 2008, he/she went with KING to MCKAY'S apartment located at 1221 North Dearborn Apartment 1606S, Chicago, Illinois. CS4 related that at this time, KING picked up $25,500 in cash from MCKAY while in the apartment.  CS4 related that KING told CS4 that MCKAY was making a partial payment for three kilograms of cocaine which KING previously "fronted" to him.

37.    CS4 related that in February of 2008, CD3 was arrested by DEA Kentucky.[5]  CS4 related that the cocaine that CD3 was in possession of was his/hers which he/she had obtained from KING.  Furthermore, CS4 related that on two occasions in February 2008, CS4 obtained a total of 27 kilograms of cocaine from KING.  CS4 related that 10 of 27 kilograms were sold and the narcotics proceeds were sent back to KING and the Mexican sources of supply.

_____

[5]On February 18, 2008, law enforcement records show that CD3 was arrested in Lexington, Kentucky.  At the time of the arrest, CD3 was driving a Chevy Trailblazer with a concealed compartment in it.  CD3 later admitted the concealed compartment contained narcotics and narcotics proceeds.  On February 22, 2008, DEA Kentucky obtained a federal search warrant for the vehicle and subsequently located approximately 8 kilograms of cocaine and approximately $242,620 in cash.  CD3 admitted that CS4 gave him/her 20 kilograms of cocaine which CS4 had obtained from KING.

CS4 related that he/she still owes KING for 17 of the 27 kilograms. CS4 related that $375,000 for the 17 kilograms was supposed to be transported back to KING and subsequently his Mexican sources of supply.[6]

38. CS4 related that on February 28, 2008, he/she went to dinner with KING in Chicago, Illinois. CS4 related that after dinner, KING advised CS4 that he had to go to MCKAY's to pick up money. KING advised CS4 to meet him back at his apartment in about an hour. CS4 related that at approximately 11:45 p.m., CS4 went to KING's apartment located at 33 West Ontario #42EN, Chicago, Illinois. CS4 related that while he/she was inside the apartment, KING told him/her he had just picked up money from MCKAY. CS4 related that a short time later, KING started to count the money in front of him/her. CS4 related that he/she counted to him/herself as KING was counting the money. CS4 related that KING had picked up $15,000 from MCKAY.[7] CS4 related that KING proceeded to place the money in an unknown location in the back bedroom of the apartment.

## 2. Cooperating Source - 5

---

[6] In a consensually-recorded conversation between KING and CS4, KING told CS4 that he/she owed him $375,000. The $375,000 equals $22,000 per kilogram of cocaine for 17 kilograms of cocaine. CS4 related that on or about February 16, 2008, he/she obtained 17 kilograms of cocaine from KING and that he/she was currently purchasing them at $22,000 per kilogram.

[7] CS4 proceeded to take photographs of KING while KING was counting the proceeds he had just picked up from MCKAY.

39.    On February 25, 2008, and April 24, 2008, agents interviewed CS5 regarding his/her involvement in the transportation of cocaine from Illinois to Kentucky for CS4.[8]  CS5 related that from 2005 to 2008, he/she transported cocaine and narcotics proceeds back and forth between Illinois and Kentucky for CS4 and KING. CS5 related that from 2005, on average he made one to two deliveries a week. CS5 related that CS4 paid him/her approximately $2,000 per trip. CS5 related that a usual trip to Chicago would consist of CS5 picking up approximately 20-30 kilograms of cocaine at a time.  CS5 stated that he/she would pick up the cocaine in parking garages in Chicago.  CS5 related that he/she utilized a Chevy Tahoe that was equipped with a concealed compartment to transport the narcotics and proceeds.  CS5 related that the concealed compartment in the Tahoe was installed in Chicago at the request of CS4.  CS5 related that he/she always utilized vehicles that were equipped with sophisticated concealed compartments which cost approximately $5,000 to install. CS5 related that once he/she obtained the cocaine, he/she delivered it to

---

[8] CS5 agreed to cooperate with law enforcement in hope of obtaining a benefit from the United States Attorney's Office relating to charges that could be filed against CS5 in exchange for the information he/she has provided. CS5 has been informed that in exchange for his cooperation and truthful information, he will not be charged in Kentucky. No promises have been made to CS5 with regard to possible charging decisions in the Northern District of Illinois. CS5 has not been paid for his/her cooperation in this investigation. CS5's basis of knowledge consists of him/her personally transporting narcotics and narcotics proceeds for KING and CS4. CS5 has no known criminal history.

CD3 in Kentucky. CS5 related that once the cocaine was sold, he/she would transport the proceeds back to KING in Illinois. CS5 related that upon arrival in Illinois, he/she would met with KING. CS5 related that at each and every meeting, KING would take his cut of the narcotics proceeds. CS5 related that KING took anywhere between $20,000 to $50,000 from the total proceeds. CS5 related that he/she then transported the rest of the proceeds to KING's Mexican sources of supply workers.

### i.    CS5 History of Narcotics Transactions with King.

40.    CS5 related that in the summer of 1999, while at a barber shop, he/she met KING. CS5 related that KING and Individual A were partners in A&M Sportswear in Lexington, Kentucky.[9]

41.    CS5 related that in 2005 he knew KING lived in Orland Park, Illinois and that he stored narcotics in his residence in the area of 111th and Princeton in Chicago, Illinois. CS5 related that he/she stayed at KING's residence in Orland Park while they (KING and CS5) were waiting for the cocaine to be delivered. CS5 related that when the cocaine was ready, KING would direct CS5 to his other residence at 111th and Princeton. CS5 related that once there, Hispanic males gave CS5 the cocaine to transport to Kentucky. CS5

---

[9]On May 17, 2007, Lexington Police seized 9 kilograms of cocaine from inside a hidden compartment of a vehicle Individual A was driving.

related that at this time he was using a blue Ford Expedition that had a concealed compartment in it. CS5 related that KING had the compartment installed in the Expedition. CS5 related that he also used a Silver Chevrolet Envoy SUV, which also contained a concealed compartment, to transport cocaine and proceeds for KING and CS4. CS5 related that at an unknown time in about 2005 or 2006, the police executed a search warrant on KING's residence near Princeton. CS5 related that KING stopped storing cocaine at the Princeton location after the execution of the search warrant.

42. CS5 related that after the warrant, he started picking up the cocaine from KING at KING's apartment in downtown Chicago. CS5 that related that during these transactions, he waited for KING in South Holland, Illinois. CS5 related that KING met him/her and then proceeded to take him/her to a downtown apartment located at 33 West Ontario, Chicago, Illinois, where CS5 was instructed by KING to pick up a vehicle previously loaded with cocaine. CS5 informed agents that CS5 picked up cocaine in this manner for KING approximately 15 times.

43. CS5 related that KING stayed in apartment 46D at the Ontario location but had recently moved into apartment 42-EN. CS5 that related that it was easy to conduct the narcotics transaction in the parking garage below KING's residence but eventually they started to use the parking garage located

on 8th and State Streets in Chicago, Illinois where he met either CS4 or a Hispanic male, later identified by both CS4 and CS5 as Individual U. CS5 stated he got cocaine from Individual U on approximately 30 different occasions. CS5 indicated Individual U was always in an Edge vehicle, which has a concealed compartment in the back of it, and that he usually would give CS5 anywhere between 20 and 30 kilograms of cocaine at a time. CS5 indicated he/she transported the proceeds back to Individual U. However, CS5 related that KING always instructed him/her to bring the proceeds to him prior to dropping it off to Individual U. CS5 related that KING would take his cut of the proceeds, anywhere between $20,000 and $50,000, before he took the rest of it to Individual U. CS5 related that he always gave Individual U and the other unidentified Hispanic males the proceeds from the sale of the previous load of cocaine and in exchange he was given more cocaine.

44.    CS5 related that by direction of CS4 and KING, he/she made approximately 10 trips to Chicago, Illinois in 2006 to a residence where he/she was met by unidentified Hispanic males. CS5 related that he/she waited while the trap vehicle was taken to be loaded with kilograms of cocaine. CS5 related that after he/she obtained the cocaine, he/she returned to Kentucky and delivered the cocaine to CD3.

45.    CS5  that from late 2006 to and including February 2008, CS5 started to meet KING at his residence located at 175 Willow Boulevard, Willow Springs, Illinois.  CS5 related that on a number of occasions, he/she stayed overnight with KING at this location while waiting for cocaine to be transported back to Kentucky.    Furthermore, CS5 indicated that on approximately 20 occasions, including and up to January of 2008, he/she transported proceeds to KING at this residence.  CS5 related he/she had no idea where in the residence KING stored the proceeds.

### 3.    Cooperating Defendant - 3

46.    On February 22, 2008, agents interviewed CD3 pursuant to a proffer agreement.[10]  CD3 related that at the time of his/her arrest on February 18, 2008, he/she was driving a Chevy Trailblazer that had a concealed compartment which contained approximately seven kilograms of cocaine and approximately

---

[10] In February of 2008, CD3 was arrested by DEA Kentucky.  CD3 agreed to cooperate with law enforcement in hopes to obtain a sentencing benefit from the United States Attorney's Office relating to charges that have been filed against CD3. CD3 has not been paid for his/her cooperation in this investigation. CD3's basis of knowledge consists of him/her personally transporting and selling narcotics for members of the KING DTO.  CD3's criminal history includes 8 arrests and 2 convictions. CD3's arrests include, among others, possession of marijuana, possession of a handgun by a felon and possession of cocaine for sale. CD3's convictions include: a 1995 conviction in Kentucky for trafficking cocaine in which he/she was sentenced to 5 years state prison; and a 2000 conviction in Kentucky for trafficking cocaine in which he/she was sentenced to 5 years state prison.

$230,000 in U.S. currency.[11] CD3 related that he/she arranged with Individual P to deliver the cocaine to Lexington, Kentucky on February 17, 2008. CD3 advised he/she had been dealing with Individual P and Individual Q for several years. CD3 related that he/she fronted cocaine to Individuals P and Q that he/she was obtaining from CS4. CD3 related that CS4 was charging him/her $23,500 per kilogram of cocaine.

47.   CD3 advised he/she has known CS4 for at least 10 years and that he/she has been purchasing wholesale quantities of cocaine from CS4 for approximately 4 years. CD3 related CS4 usually fronted him/her 10-15 kilograms of cocaine twice per month. CD3 related that on some occasions, the quantities would not be as large.

48.   CD3 related that in about January 2008, CS4 provided him/her with at least two loads of cocaine each between 20 to 30 kilograms of cocaine. CD3 related he/she sent CD4 to pick up the cocaine from CS4. CD3 related he/she used CD4 in the past to transport narcotics and narcotics proceeds between Illinois and Kentucky. CD3 related he/she usually had CD4 drive a vehicle with

---

[11] On February 22, 2008, DEA Kentucky and members of the Lexington Police Department conducted a consent search of a Chevy Trailblazer that CD3 was driving at the time of his arrest. During the search, law enforcement located approximately 8 kilograms of cocaine and $242,620 in cash. CD3 subsequently surrendered additional narcotics proceeds to law enforcement. The approximately total proceeds seized form CD3 was $1,131,635.

a concealed compartment to Chicago, Illinois. CD3 related he/she directed CD4 to meet with one of CS4's guys in and around Chicago, Illinois. CD3 related CD4 picked up the cocaine and proceeded to drive it back down to Lexington, Kentucky. CD3 related he/she paid CD4 $1,000 per trip.

49. CD3 related that he/she was selling CS4's kilograms of cocaine in Lexington, Kentucky for $25,000 per kilogram. CD3 related he/she was utilizing a Chevy Monte Carlo that had a concealed compartment under the back seat to transport the cocaine around Kentucky. CD3 related that the concealed compartments in the Monte Carlo and the Trailblazer were installed by CS4's people in Chicago, Illinois.

50. CD3 related that CS4's cocaine source of supply is from Chicago, Illinois and is known to CD3 as "FAT MIKE." CD3 further stated that "FAT MIKE" was utilizing a Mexican source of supply. CD3 was later shown a photograph of KING and related that KING was the subject he/she knew "FAT MIKE."

## IV.    Narcotics and Narcotics Proceeds Seizures from the King DTO.

### A.    Seizure of Approximately 9 Kilograms of Cocaine from Individual A in Lexington, Kentucky.

51. On May 17, 2007, DEA Kentucky obtained a federal search warrant for a Nissan Pathfinder that was seized on April 3, 2007, after law enforcement observed Individual A use it to facilitate a narcotics transaction. During the

search, agents located a hidden compartment under the rear seat area of the floorboard. Agents located approximately nine kilograms of cocaine inside the hidden compartment. Subsequent to the seizure, agents obtained a federal arrest warrant for Individual A. Individual A was arrested, charged and has since pled guilty to possession with intent to deliver over five kilograms of cocaine. On multiple occasions, described below, CS4 had recorded discussions with KING regarding Individual A's arrest and the trap compartment located in the seized vehicle.

52 .   On March 3, 2008, CS4 met with KING. This meeting was consensually recorded. At approximately 12:10 p.m., CS4 stated, "It would be different if I had a problem not getting rid of it, I don't think I ever had a problem getting rid of it [narcotics].   Expect when you use to give the shit to Live (Individual A) and he would give stuff to my customers.   Other than that...." KING stated, "Obviously they weren't your customers."[12] CS4 stated, "Obviously Live would came through with that old New York, New York fuck with New York fuck with him." KING stated, "Man ain't nobody do that they like fucking with him, you can't knock that." CS4 replied, "No but I'm saying, if you didn't give him what you was giving me [narcotics], then they wouldn't have a choice but to fuck

---

[12] The identity of KING's voice was made by, among other things: CS1's identification of KING's voice; CS4's identification of KING's voice; and agents who have heard KING on other recordings identification of KING's voice.

with me. But it don't matter, all the niggers he fucked with was hot" [all of Individual A's associates in Kentucky had either been arrested or were suspected of cooperating with law enforcement].

53.   On June 4, 2008, at approximately 12:51 p.m., CS4 placed a consenually-recorded call to KING. During the call, CS4 stated, "They ah they going to get nigger's paperwork now. Guess who they say told on Live (nickname for Individual A)?" [who provided information to law enforcement leading to Individual A's arrest]. KING stated, "Huh?" CS4 said, "I said they going down there and getting nigger's paperwork [court papers]. You know how the paperwork is public record?" KING stated, "Yeah I told you that. See what it say (UI)." CS4 stated, "Yeah we ain't never really did that shit. So they doing that shit now. And ah guess who they said told on your dude (Individual A)?" KING asked, "Who?" CS4 stated, "Waldo." KING stated, "Straight up?" CS4 stated, "Yep, just as I suspected the whole time." KING stated, "You shit..." CS4 later stated, "What I think happen is Live got on, and you know how lazy the fuck he is, he got on and ah he called everybody and told them yeah it is going to be tomorrow or whatever, and that nigger got wind of it and he told them people [police]. And them people watch Live go over there and get that dope. And they did not know that Live had a stash in that car cause if they did...." KING stated, "Right." CS4 stated, "They would have went ahead and knocked that shit out

28

that day, they went like two three weeks, a month, it was about a month before they even found that shit wasn't it?" KING stated, "Yeah. Yeah we came back together." CS4 later stated, "So I don't think they waited a week and she told them how to get into that truck." KING stated, "She told them how to get into it?" CS4 stated, "Na, I don't think so, I think they tore that mother fucker...." KING stated, "She didn't know how [meaning Individual A's girlfriend did not know how to get into the "trap" located in the his vehicle]. CS4 stated, "Right, yeah. That makes sense." KING said, "She didn't know how."

**B.    Seizure of Approximately 396.6 Grams of Heroin from Individual FF in Chicago, Illinois Attributed to McKay.**

54.    On November 27, 2007, at approximately 8:58 p.m., CPD officers received information regarding a subject selling narcotics out of a dark colored Dodge in the area of 10141 South LaSalle, Chicago, Illinois. A short time later, CPD officers went to the location and established surveillance. Upon arrival, officers observed Individual FF sitting in a 2008 Dodge four door, bearing Illinois license plate 972-9263. CPD officers maintained surveillance on the Dodge. Approximately fifteen minutes later, CPD officers observed an unidentified male approach the vehicle and proceed to hand Individual FF a large plastic bag. CPD officers approached the Dodge to effect an arrest on Individual FF. As they approached, CPD officers observed Individual FF attempt to put the plastic bag under his coat. CPD officers arrested Individual FF and recovered the plastic

29

bag.   Inside the bag, CPD officers observed four smaller plastic baggies all containing a tan rock-like substance.  The substance was later sent to the Illinois State Crime Lab for testing and analysis.   The substance tested positive for heroin.

### 1.    Statement made by Individual FF and Information Learned from CS4.

55.   Officers subsequently read Individual FF his *Miranda* rights.   While talking with Individual FF, he/she stated, "It's not mine, I was just told to pick it up and drop it off."   Additional, the vehicle Individual FF was arrested in was registered to Individual KK.   Individual KK is a known girlfriend of MCKAY's.

56.   In an unrecorded conversation, CS4 related that KING told him/her that Individual FF was arrested with his narcotics.  CS4 related KING stated that MCKAY owes him for the seized heroin.

### 2.    Intercepted Wire Communications over Target Phone 1 Regarding Individual FF's Arrest.

57.   On December 11, 2007, at approximately 4:56 p.m., Individual GG received an incoming call, (call 5047), from Individual CC, over **Target Phone 1**. During the call, Individual GG asked, "You all right though?" Individual CC replied, "Yeah, I'm alright." Individual GG stated, "Yeah I was all spaced out, I tell you about it you going to freak out man.  Then Rod [MCKAY] had a situation (Individual FF's arrest)." Individual CC stated, "Straight up?"  Individual GG

30

replied, "Yeah, had, man we both had two of them back to, he had one first (November 27, 2007) and my was the same day you had called (arrest on November 30, 2007)."

58.    At approximately 6:10 p.m., Individual GG placed an outgoing call, (call 5058), to an unidentified male, over **Target Phone 1**. As the phone was ringing, Individual GG in the background was overheard talking to a unidentified male. Individual GG said, "You know Rod's (MCKAY) guy got popped (arrested) too." The unidentified male asked, "Who?" Individual GG stated, "He got caught with 600 grams."

C.    <u>Narcotics Seizure from Individual GG and Individual HH.</u>

59.    On November 30, 2007, at approximately 11:01 a.m., Individual GG made an outgoing call over **Target Phone 2** (call 1378) to MCKAY who was using **Target Phone 7**.[13] During the call, MCKAY stated, "She told me last night when I got in but it was late. You up?" Individual GG responded, "I been up man. I was giving you time, thought you might be talking about you might of been asleep." MCKAY stated, "Man, I been out since 8:30 a.m." MCKAY then stated, "Slide out west right fast." Individual GG replied, "I gotta have Chuck pick me up, man."

---

[13]The voice identification for MCKAY is based on CS4's identification of his voice.

60.   At approximately 1:38 p.m., Individual GG placed an outgoing call, (call 1382), to MCKAY who was using **Target Phone 7**, over **Target Phone 2**. During the call, Individual GG asked MCKAY, "Where you want to bump, shit, I ain't really got nowhere to go but uh." MCKAY replied, "Why don't you just wait about ten or fifteen, just chill there for a few minutes and then like when I get to Sconnie's you just start leaving or something and then you just meet me over on Crystal [MCKAY's parents' residence located at 5455 West Crystal Street, Chicago, Illinois]. Individual GG stated, "I have Chucky drop me off at my momma house [1400 South 21st Avenue, Maywood, Illinois] in my truck [2007 Chevrolet Tahoe bearing Illinois plate 901-9050] and then I come out west by Whopper and fuck with him for a minute." MCKAY replied, "All right, I'll meet you over there [5455 West Crystal].

61.   At approximately 2:29 p.m., Individual GG received an incoming call, (1388), from MCKAY who was using **Target Phone 7** over **Target Phone 2**. During the call, MCKAY stated, "What up?" "I'm fittin to leave Sconnie house now." Individual GG asked, "Yo mamma's?" MCKAY replied, "Yeah, you can meet me there [5455 West Crystal]."

62.   At approximately 2:57 p.m., agents observed Individual GG driving his Tahoe, bearing Illinois license plate 901-9050, and arrive at 5455 West

Crystal Street, Chicago, Illinois. At this time, agents observed Individual GG park on the south side of the street near the residence.

63.    At approximately 3:08 p.m., agents observed two Hispanic females pull up in a green Lexus LS400, bearing Illinois Law Enforcement (LE) plate 3839LE. Based on the arrest described below, agents later identified the females as Individual HH and her sixteen year old daughter. Agents observed Individual HH proceed to park directly in front of Individual GG's Tahoe. Agents observed both Individual GG and Individual HH remain in their vehicles.

64.    At approximately 3:10 p.m., Individual GG placed an outgoing call, (call 1393), to MCKAY who was using **Target Phone 7** over **Target Phone 2**. During the call, Individual GG asked MCKAY, "Where you at doggy?" MCKAY replied, "You know this traffic is fucked up, shit." MCKAY then asked, "You on your way there, you there already [at 5455 West Crystal]?" Individual GG replied, "Yeah, I been here, I been here for like twenty minutes, fifteen, my girl [Individual HH] here too so." MCKAY later stated, "I'm coming off now on Kostner, I'm on my way."

65.    At approximately 3:46 p.m., agents observed Individual GG depart the area. Immediately thereafter, agents observed MCKAY pull up in a blue

Dodge truck bearing Illinois plate 34224L, and proceed to park directly behind Individual HH.[14]

66.    At approximately 3:50 p.m., agents observed MCKAY exit the truck. At approximately 3:53 p.m., agents observed MCKAY walk up to the passenger side of Individual HH's vehicle.    Agents observed MCKAY engage in a conversation with Individual HH while standing at the passenger side window. Shortly thereafter, agents observed Individual HH depart the area.

67.    Based on the above-intercepted calls, surveillance adn the later post-arrest statements of Individual HH, I believe that MCKAY delivered 41.3 grams of heroin to Individual HH.

68.    Agents maintained constant surveillance on the Lexus as it departed the area. At approximately 546 North Ridgeland Avenue, the CPD conducted a traffic stop on the Lexus for a traffic violation.    During the stop, the CPD approached the driver, Individual HH.    At this time, CPD officers observed Individual HH make a sudden movement to her front jacket pocket.  CPD officers asked Individual HH to exit the vehicle for officer safety.  CPD officers proceeded to ask Individual HH if she was attempting to conceal something at which time Individual HH stated, "I got some drugs on me."  Individual HH then reached into her jacket pocket and produced a clear plastic bag containing a dark in color,

---

[14]MCKAY has been identified based on intercepted wire communications, subsequent surveillance, and a comparison to official photographs.

thick substance, that appeared to be brown tar heroin. CPD officers seized the substance. The suspect heroin was subsequently sent to the Illinois State Police Lab. The lab indicated the substance was 41.3 grams of heroin. Individual HH was arrested.

### 1.   Post Arrest Statement of Individual HH

69.   On November 30, 2007, at approximately 4:45 p.m., CPD officers conducted a post arrest interview of Individual HH. CPD officers proceeded to read Individual HH her *Miranda* warnings. Individual HH stated she understood her rights and was willing to cooperate with law enforcement. CPD officers asked Individual HH about the events leading up to her arrest. Individual HH related she had approximately 50 grams of heroin in her possession. Individual HH related she obtained the heroin from an unidentified, heavy set, black male with braids (a description that matches MCKAY). Individual HH related she met the unidentified male by a gas station located in the area of Central and Division Streets, Chicago, Illinois. Individual HH related the black male drives a black pickup truck. Individual HH further related the heroin was prepaid, and that no money was exchanged at the meet location. Individual HH related she paid $50 a gram. Individual HH related she usually is "fronted" the narcotics and pays the supplier at a later time. Individual HH related she has purchased narcotics on three different occasions from the heavy set black male with braids. Upon

search of her person, CPD officers located approximately $1,831 on Individual HH. She stated that she obtained the money from bartending.

### D.  Narcotics Seizure from MCKAY and Individual S.

70.    On February 7, 2008, at approximately 9:24 p.m., MCKAY received an incoming call, (call 79), from Individual S, over **Target Phone 7**. During the call, MCKAY asked Individual S, "I said what you on?" Individual S stated, "Shit I'm in traffic, I'm out you um, trying to wait for you to hit me back on that (Individual S was waiting for MCKAY to call him/her back about supplying him/her with narcotics). MCKAY replied, "Yea, I just been running hard" [selling a large quantity of narcotics]. Individual S stated, "Huh?" MCKAY stated, "I just been running kinda hard shit that's all you know how this shit goes." Individual S replied, "Yea....shit just let me know what's up man, what you need the mother fucker to do man." MCKAY replied, "I'll be back out there tomorrow, you all right?" Individual S replied, "Yea I'm good." MCKAY asked, "Shit been working out for you [meaning are the narcotics good]?" Individual S replied, "I'm maintaining you know, can't complain." Individual S later told MCKAY, "Yea you been having me thinking about the shit since I talked to you." MCKAY replied, "Right. I'll be that way tomorrow, I just ain't been that way really shit." Individual S said, "Right." MCKAY stated, "Been more out west." Individual S

stated, "Okay. You hit me up man when you get here, I'm gonna be around."
MCKAY said, "Alright."

71.    At approximately 4:42 p.m. on February 8, 2008, MCKAY placed an outgoing call, (call 208), to Individual S, over **Target Phone 7**. During the call, MCKAY asked Individual S, "Shit, you south?" Individual S stated, "Yep." MCKAY replied, "Won't you slide on me then." Individual S stated, "Where you at?" MCKAY said, "Over there on Hyde Park Boulevard." Individual S asked, "You gonna be there for about fifteen, twenty minutes." MCKAY replied, "Yep." Individual S stated, "Alright, I'll be there in a minute."

72.    At approximately 4:42 p.m., surveillance  observed a white Dodge Charger, bearing Illinois License Plate 807-6963, parked in front of 924 East Hyde Park Boulevard, Chicago, Illinois. Surveillance agents observed Individual S park his Charger on the north side of the street and subsequently observed Individual S exit the vehicle.  Agents observed Individual S exit the Dodge Charger and walk towards the apartment building through a black metal gate.

73.    At approximately 4:43 p.m., MCKAY received an incoming call, (call 235), from Individual S, over **Target Phone 7**.  During the call, Individual S stated, "I'm pulling up." MCKAY replied, "Alright, you know how to come in through the gate?" Individual S said, "Alright."

74.    At approximately 4:45 p.m., surveillance observed Individual S shake hands with MCKAY near the front entryway of 924/926 East Hyde Park Boulevard. At approximately 4:46 p.m., surveillance observed Individual S walk into the common entryway of 924/926 East Hyde Park Boulevard.

75.    Based on intercepted calls, surveillance and the seizure described below, your Affiant believes that MCKAY delivered approximately 25 grams of crack cocaine to Individual S.

76.    At approximately 6:15 p.m., surveillance observed Individual S exit the apartment building through the same common entryway for 924/926 East Hyde Park Boulevard and get into the Dodge Charger. Shortly thereafter, surveillance observed Individual S depart the area.

77.    Agents maintained surveillance on Individual S until approximately 6:22 p.m. At this time, a CPD unmarked narcotics unit initiated a traffic stop for a traffic violation on Individual S at 46th Street and Greenwood Avenue, Chicago, Illinois. During the traffic stop, CPD approached the lone occupant of the vehicle, Individual S.  CPD got consent from Individual S and subsequently searched Individual S's vehicle.  While searching the passenger compartment of the vehicle, a CPD officer located a Frito's can with a false removable bottom.  The CPD officer  proceeded to open the can and inside the false bottom located three

clear plastic baggies.  Inside two of the baggies the CPD officer observed rock shaped substances.

78.     The substance inside the baggies was sent to the Illinois State Police laboratory for analysis and was determined to be approximately 25 grams of cocaine base.  Based on its appearance, texture, and chemical composition, your Affiant believes the substance in the baggies was crack cocaine.

79.     Individual S was released from custody without being charged so as not to compromise the ongoing investigation.

E.     **Seizure of Approximately 13 Kilograms of Cocaine and Approximately $1,131,635 in Narcotics Proceeds from CD3 in Lexington, Kentucky.**

80.     On February 18, 2008, law enforcement agents in Kentucky seized approximately five kilograms of cocaine from the area of 375A Radcliff Road, Lexington, Kentucky.   Law enforcement subsequently arrested CD3.    On February 22, 2008, DEA Kentucky obtained a federal search warrant for the vehicle CD3 was driving at the time of his/her arrest.[15] During the search, law enforcement recovered approximately eight kilograms of cocaine and approximately $242,620 in narcotics proceeds located within a hidden compartment inside CD3's vehicle.  CD3 subsequently turned over an additional

---

[15] CD3 was driving a Chevy Trailblazer when he/she was arrested.   The Trailblazer was equipped with a hidden compartment.  Agents learned from CS4 that KING's Mexican sources of supply had the compartment installed in the Trailblazer.

39

$889,015 of narcotics proceeds to agents, $589,920 of which was stored in a concealed compartment located in the wall of a residence owned by CD3's father. CD3 later related the "wall safe" was installed by Individual L.[16]

### 1. CD3's Statements Regarding the Seized Narcotics and Narcotics Proceeds.

81.    CD3 related that prior to February 14, 2008, CS4 "fronted" him approximately eight kilograms of cocaine. CD3 related he/she distributed the cocaine to Individuals P and Q. CD3 related on February 17, 2008, CD4 obtained approximately twelve kilograms of cocaine from CS4 in Chicago, Illinois. CD3 related CD4 transported the cocaine to Kentucky and CD3 started to distribute them. CD3 related he/she was subsequently arrested. CD3 related at the time of his/her arrest, he/she owed CS4 for 20 kilograms of cocaine: approximately $470,000.[17]

### 2. CS4 Statements Regarding Seized Narcotics and Proceeds.

82.    CS4 related the cocaine that CD3 was in possession of was his/hers which he/she had obtained from KING. Furthermore, CS4 related that prior to

---

[16] CS4 related to agents that he/she got permission from KING to have Individual L go to Kentucky to install the concealed compartment in CD3's fathers residence. Furthermore, CS4 related Individual L is the subject he/she witnessed installing KING's "wall safe"at his current residence in Willow Springs, Illinois. Additional, agents have intercepted wire communications between KING and MCKAY regarding Individual L bringing "materials"over to MCKAY's residence located at 1221 North Dearborn, Chicago, Illinois.

[17] CD3 related CS4 was charging him/her $23,500 per kilogram of cocaine.

February 17, 2008, he/she obtained approximately 27 kilograms of cocaine from KING. CS4 related some of the kilograms were sold and the narcotics proceeds were sent back to KING and his Mexican sources of supply. CS4 related he/she still owed KING for approximately seventeen kilograms of cocaine. CS4 related $375,000 of the proceeds seized from CD3 was supposed to be transported back to KING and subsequently his Mexican sources of supply.

### 3.    Unrecorded and Recorded Conversations between CS4 and King Regarding the Seized Narcotics Proceeds.

83.    During the week of February 18, 2008, during unrecorded conversations between CS4 and KING, KING told CS4 to go inside CD3's residence and retrieve the narcotics proceeds from the concealed compartment inside the wall of CD3's residence. CS4 related he/she would try to get it and call him back. CS4 later contacted KING and advised him that the police had seized the narcotics proceeds from inside CD3's residence.

84.    On or about February 22, 2008, CS4 placed a consenually-recorded call to KING.[18]  During the call:

(a)    KING asked CS4, "You heard (UI) [asking about CD3]?"CS4 replied, "Naw, I haven't heard nothing else. I heard they ah, they raised his bond [CD3]." KING stated, "Raised it?"  CS4 said, "Yeah, or change...." KING asked, "To what?" CS4 stated, "I don't know, the mother fucker that told me, would not

---

[18]

tell me." KING later asked, "So what you think you going to be able to do over there [how many kilograms of cocaine can you sell at a time in Kentucky]." CS4 asked, "Down here?" KING replied, "Yeah." CS4 stated, "I don't know, I tried to holler at the one nigger he said he good for three [CS4 has a customer that will purchase 3 kilograms at a time], and then uh I talked to this one dude about his Mexican, I think I might need to holler at the Mexican because, like the Mexican real cool act like a nigger whatever, because uh them mother fuckers got money and can't (UI)."

     (b)    Later in the conversation, KING asked, "How many can you do at a (UI), ten, five [how many kilograms of cocaine can you sell at a time]?" CS4 asked, "What did you say?" KING stated, "I said, 'How many can you do at (UI)?'" CS4 asked, "How many can I grab what?" KING asked, "I said how many can you grab (UI)?" CS4 stated, "I have no idea what the fuck you said." KING stated, "How many a week over there [how many kilograms of cocaine a week can you sell in Kentucky]?" CS4 stated, "Ah, I don't know how hot do you want me to get?" KING replied, "Huh?" CS4 stated, "How hot do you want me to get?" KING stated, "That's up to you, whatever you want to do. (UI) five, I don't care, as long as you going to pay your fucken bills you know what I'm saying." CS4 said, "Right." KING stated, "You can do one [one kilogram]. I don't give a fuck." The call was then dropped. KING then proceed to call CS4 back. During this

recorded conversation, KING stated, "The bill got to get paid [owed narcotics proceeds to KING's Mexican sources of supply which were seized need to be paid off]." CS4 asked, "What about the truck though?" KING replied, "I'm saying we going to get that, but I'm just saying they ain't just going to give us, we got to give them something." CS4 stated, "I know, I mean I know." KING said, "Shit they even (UI) for the last fucken truck." CS4 stated, "I know."

85.    On or about February 28, 2008, CS4 received an incoming call from KING. During the consensually-recorded conversation, KING stated, "A week later I (UI) I want to have my money. I mean I would have gave it to him but shit he ain't tripping. He like so what do you want me to do with the money? I'm like dude don't ask me that." CS4 stated, "A trick question." KING said, "Yeah." CS4 stated, "I know that's my debt, I got to get it back that's why, I. . . ." KING replied, "Hell yeah that's your debt, $350,000." CS4 stated, "Ah that's good I thought it was 375 (meaning $375,000), so 25 (meaning $25,000) of it was yours so you going to let me slide on it?" KING replied, "No nigger, ah how much was it?" CS4 stated, "It was 375 ($375,000)." KING stated, "I got to count it, ah shit, if I would have known that, I would never even agreed to that. I don't even think about that." CS4 asked, "How much money it was?" KING stated, "Hell yeah it was." CS4 stated, "I know cause you wasn't dealing with it. 17, it was 20, 27."[19]

---

[19] To this date, CS4 still owes KING approximately $375,000 in narcotics proceeds for seized narcotics.

**F.    Seizure of Approximately 8 Kilograms of Cocaine and Approximately $16,931 in Narcotics Proceeds in Chicago, Illinois.**

86.    On or about May 26, 2008, CS4 contacted DEA-Chicago agents and told them that he/she had recently been contacted by KING, who told CS4 that wholesale quantities of cocaine were ready to be picked up if CS4 wanted them. Prior to this transaction, during an unrecorded conversation, KING told CS4 that the price per kilogram of cocaine had increased to $24,000 per kilogram. During a series of unrecorded calls between KING and CS4 and a recorded call between MCKAY and CS4, KING and MCKAY told CS4 to come to MCKAY's residence at Hyde Park [924 East Hyde Park, Boulevard Unit 2W, Chicago, Illinois], and CS4 understood the purpose of the meeting was to make arrangements for KING to "front" CS4 with multiple kilograms of cocaine.

87.    DEA provided CS4 with an electronic transmitting and recording equipment and also furnished CS4 with an undercover vehicle. CS4 and the undercover vehicle were searched for narcotics, money and/or other contraband and the searches were negative.

88.    Later that same day, CS4 drove the undercover vehicle to MCKAY's residence located at 924 East Hyde Park, Boulevard Unit 2W, Chicago, Illinois. DEA agents conducting surveillance saw CS4 arrive at the residence at approximately 9:19 p.m.

89.    Upon arrival, CS4 walked up to the second floor and entered

44

MCKAY's residence. According to CS4, when CS4 entered the residence, he was met by KING, MCKAY, and Individual T. During the recorded meeting, KING told CS4 and Individual T to go and pick up wholesale quantities of cocaine from an individual who was a narcotics transporter for one of KING's Mexican sources of supply.

90. At approximately 9:40 p.m., surveillance saw CS4 and Individual T leave MCKAY's residence and depart the area, with CS4 driving the undercover vehicle and Individual T driving a blue Mercury Mountaineer, bearing Kentucky license plate 085-GDB (the "Mountaineer"). Surveillance followed the vehicles to the parking garage located at 2 East 8th Street, Chicago, Illinois.[20]

91. At approximately 9:53 a.m., surveillance observed Individual T and CS4 pull into the parking garage located at 2 East 8th Street. CS4 indicated he/she drove the undercover vehicle to the forth floor of the garage, where he/she saw Individual T park next to a maroon GMC SUV, Illinois plate X38-3261. CS4 parked on the other side of the GMC, got out of the undercover vehicle and met with Individual T. At that time, CS4 said he saw that the concealed compartment in the Mercury driven by Individual T was open and Individual T was trying to remove a a black duffel bag from the compartment. CS4 indicated

---

[20] As stated earlier in this Affidavit, DEA agents were familiar with this parking garage at 2 East 8th Street, Chicago, Illinois, because CS4 had told the agents that KING often uses the garage as a meeting place to exchange multiple kilograms of cocaine and large sums of narcotics proceeds with workers employed by one of KING's Mexican sources of supply.

that he/she helped Individual T pull out the duffel bag and CS4 noticed that it contained a large sum of U.S. Currency.  At that time, CS4 indicated that an unknown Hispanic male got out of the GMC and met with Individual T and CS4. CS4 said that Individual T then gave the duffel bag to the unknown Hispanic male, who in turn gave Individual T another duffel bag containing multiple kilograms of cocaine.

92.    According to CS4, Individual T then removed approximately eighteen kilograms of cocaine from the other duffel bag and loaded them into Mountaineer's concealed compartment.  CS4 then proceeded to place the duffel bag with the remaining kilograms of cocaine in the undercover vehicle.  At approximately, 10:03 p.m., surveillance saw all three individuals drive out of the garage in their respective vehicles and the agents followed CS4.

93.    Agents maintained constant surveillance on CS4 and at approximately 10:16 p.m., surveillance saw CS4 return to MCKAY's residence at 924 East Hyde Park Boulevard, park the undercover vehicle and go into the entryway of 924 East Hyde Park. According to CS4, CS4 proceeded to meet with KING and MCKAY inside the apartment.  During a recorded conversation, CS4 asked KING if the money belonged to Individual R.  KING said no.  CS4 asked KING how many kilograms of cocaine KING was providing to Individual R and KING replied, "three," meaning that three of the eighteen kilograms of cocaine

that CS4 and Individual T had just acquired were going to be delivered to Individual R.

94.    At approximately 10:48 p.m., surveillance agents saw CS4 leave MCKAY's residence and drive to a pre-arranged location where CS4 met with the agents and turned over the black duffel bag containing approximately five kilograms of cocaine.

95.    DEA agents proceeded to a business located at 16114 South Vandustrial, South Holland, Illinois, which CS4 had informed agents was Individual T's place of business. When agents arrived at the business, they saw the Mountaineer parked in front of the business. Agents then saw Individual T engaged in a meeting with Individual R, who KING had indicated was to receive three of the kilograms of cocaine (see ¶ 93 above).  After the meeting between Individual T and Individual R, a Cook County sheriff conducted a traffic stop for a traffic violation on both Individuals T and R.

96.    During this stop, Individual T agreed to return to his place of business and he provided DEA agents with verbal and written consent to search the business.  Inside the business, agents recovered $16,931 on a desk in the main office.  A Cook County K-9 narcotics detecting dog conducted a perimeter search around the Mountaineer and gave a positive alert for the presence of narcotics in the rear of the vehicle.

97.   Based on the positive alert by the narcotics detecting dog, the agents seized the Mountaineer and later conducted a search of the vehicle. During the search, agents located approximately three kilograms of cocaine hidden in the concealed compartment of the Mountaineer, which was located under the rear seat of the vehicle.[21]

98.   In the days following the May 26, 2008 acquisition of five kilograms by CS4 from KING, DEA agents directed CS4 to make a series of recorded calls to KING, telling him that CS5 had traveled to Chicago in order to take possession of the undercover vehicle with the five kilograms of cocaine from CS4, and to take it back to Kentucky. Furthermore, DEA agents directed CS4 to advise KING during the recorded calls on how CS4 was doing in regards to the sale of the five kilograms of cocaine in Kentucky.

99.   During one of those calls, on or about June 6, 2008, KING told CS4 that he had recently talked to "Slow Poke," which was the nickname that KING and CS4 used to identify KING's Mexican source of supply. During the call, KING stated, "He had mentioned it last night.....He should be done by now, I said well . . ." [KING's Mexican source of supply told KING that CS4 should have sold the five kilograms of cocaine already and be ready to repay KING for

---

[21]   It should be noted that the three kilograms of cocaine found in the Mountaineer had exactly the same wrapping and markings as the five kilograms of cocaine that MCKAY and KING had provided to CS4.

the fronted narcotics]. CS4 replied, "I am, you know, I was working. I'll be done though. I'm going to have him leave Monday because he had some party Sunday" [CS5 had not left Kentucky with narcotics proceeds yet because CS5 had a party on June 8, 2008]. KING stated, "Here we go again" [KING was not happy with the delay by CS4 and CS5 in selling the narcotics to their customers in Kentucky, which was going to result in a delay in payment to KING and his Mexican source of supply].

100.    Because of KING's impatience in getting the money owed to him by CS4 for the five kilograms, DEA agents instructed CS4 to call KING and provide him with a ruse story, that is, that the narcotics proceeds from the sale of the five kilograms of cocaine had been seized from CS5 during a routine traffic stop. On or about Monday, June 9, 2008, at approximately 2:48 p.m., CS4 had a consensually-recorded conversation with KING:

(a)    KING stated, "Yeah, what's up?" and CS4 replied, "Man you ain't going to believe this.....You ain't going to believe it. [CS5] got pulled over" [CS4 was telling KING that CS5 was pulled over by the police while traveling back to Chicago with the narcotics proceeds from the sale of the five kilograms of cocaine in Kentucky]. KING stated, "All fuck" and CS4 continued, "[CS5] was speeding in a fucking construction zone. Doing sixty-two in a fifty-five" [CS5 was pulled

over by the police for traveling 62 miles per hour in a construction zone where the speed limit was 55 miles per hour].

(b)     As the call continued, KING asked, "[CS5] ain't lose nothing did [CS5]?" and CS4 replied, "Yeah, man.  They found it" [KING was asking if the police found and seized the narcotics proceeds and CS4 confirmed that the police did find the money].  KING stated, "Dude!" and CS4 replied, "I know man.  I already know" [CS4 knew that he/she and CS5 had made a mistake and were in trouble with KING and his Mexican source of supply for losing the narcotics proceeds].

(c)     KING asked, "All of it?" and CS4 replied, "Yeah.  They found it. [CS5] said they tore the god-damned car apart and shit, they gave [CS5] all kinds of fucking tickets" [CS4 confirmed that all of the narcotics proceeds from the sale of the five kilograms had been found in the trap vehicle and seized by the police and they cited CS5 for several traffic violations].  KING stated, "Ah, fuck!" and CS4 replied, "[CS5] is all fucked up" [CS5 knew he/she was in trouble with the police and the DTO and very concerned about the seizure of the money].  KING repeated, "Dude!" and CS4 stated, "I already know, man.  I didn't even know how to call and tell you" [ KING was upset and CS4 knew that KING would be upset].

(d)     KING stated, "I told you that car wasn't right, man"[KING had told

50

CS4 that he did not like the trap in the vehicle that CS4 and CS5 used to was using to transport the cocaine to Kentucky and the money back to Chicago]. CS4 stated, "It wasn't that. [CS5] was fucking speeding. I mean, after they pulled [CS5] over, [CS5] said they was tripping. [CS5] knew they were going to do something cause they had [CS5] sitting there forever. Cause [CS5] had the Illinois tag on" [CS4 was explaining that there wasn't a problem with the trap, but that CS5 was speeding and the trapped vehicle had Illinois plates, which led to Kentucky police pulling over CS5]. KING stated, "I told you to switch it. You don't listen" [KING had advised CS4 to use a different car or to use different license plates to avoid attracting the attention of law enforcement and he was upset that CS4 had not followed his advice]. CS4 stated, "I know man. I'm fucked, man. All the money I done made was in there."

(e)     As the call continued, KING asked, "When I ask you to do it.....Where was [CS5] at?" CS4 stated, "Shelbyville or somewhere." KING noted, "Damn, [CS5] didn't make it that far" [CS5 was pulled over by the police in Shelbyville, Kentucky, which is approximately 25 miles away from Louisville, Kentucky]. CS4 stated, "Yeah, [CS5] was speeding in a construction zone. They say it was one fucking lane all the way up there" and KING replied, "Ah, man. Dude, I don't even know how to tell them this shit" [KING did not now how he was going to tell his source of supply about the seizure of narcotics proceeds]. CS4 stated, "Me

51

neither. I think [CS5] just called too. I didn't even answer the phone.....I think [CS5] just called I didn't even answer the phone. Cause there was, when you missed a call, there was a private call too. I'm scared to answer the phone for [CS5]" [CS5 had just called CS4 while he/she was trying to reach KING, but CS4 was frightened to answer CS5's call because CS5 was in trouble with the police].

(f)    KING asked, "They let [CS5] go?" [ KING wanted to know if the police released CS5 after the money seizure]. CS4 stated, "Yeah. They gave [CS5] a bunch of fucking tickets" and KING replied, "God damn, boy. I swear to God.....Did [CS5] at least have insurance?" CS4 answered, "Yeah," and KING stated, "I told the mother fucker.....place is dead down there" [KING had warned CS4 and CS5 to be careful driving in Kentucky because it was sparsely populated and law enforcement might notice them]. CS4 stated, "I think, not so much that, is that fucking payment shit. They plates is what got [CS5] hot"[CS4 thought that the Illinois license plates on the trapped vehicle is what drew the attention of the police to CS5]. KING asked, "Why the fuck was [CS5] speeding?" and CS4 replied, "Sixty-two in a fifty-five. I couldn't even be mad at [CS5]. [CS5] was like, 'I wasn't fucking speeding.....I didn't know it was construction work zone,' or some shit." KING stated, "Dude, they deaf on that sh.....Ah, man, I don't even know how to fucking call this dude and tell him this shit"[KING knew that

the police do not listen to excuses and that he did not know how to explain the seizure to his Mexican source of supply]. CS4 then stated, "I don't even know. I'm fucked. I'm so fucked."

(g)    Later in the call, KING stated, "I told you. I was like, 'Dude, that ain't going to fly. Get it fixed first. Get it fixed first'" [KING had warned CS4 to fix the hidden compartment in the vehicle driven by CS5]. CS4 replied, "I know. [CS5] mad at me because [CS5] didn't look at the thing or nothing and [CS5] said the motherfuckers were back there, like quick" [CS5 was angry with CS4 because the hidden compartment need to be repaired and because it wasn't, the police were able to find it quickly]. KING agreed, "Yeah. I told you. I was like, 'That shit ain't going to work'" and CS4 replied, "[CS5 is] more mad at me than you. I thought you were going to be more mad than [CS5]." KING stated, "I madder than a motherfucker. We ain't going to be able to get shit 'cause you don't fucking listen to me" [KING was very angry because CS4 did not follow his instructions about repairing the hidden compartment]. CS4 stated, "[CS5] cuss me out. I thought [CS5] was ready to fucking fight" and KING replied, "Yeah. Cause you got [CS5] all fucked up. Now I'm fucking angry. Hold on, I'll call you back."

101.    A short time later that same day (June 9, 2008), KING called CS4. During this recorded call:

(a)    KING stated, "I don't know what the fuck you going to do,

dude.....All I do is ask you to fucking listen to me.  That's all I do.  I said, 'Dude

get that shit fixed.  All that won't take but a second.'  But you never fucking went.

You sat around got your fucking cable did.....But you couldn't take that fucking

car to get fixed.....That's fucking, that's like six-hundred fucking thousand I owe"

[KING was angry with CS4 for not following his instructions and now KING

owed his Mexican source of supply $600,000 for narcotics and proceeds that had

been seized by law enforcement from his DTO.  Your affiant believes this figure

included the $120,000 supposedly seized from CS5 and the previous seizure of

cocaine and narcotics proceeds in February 2008].  KING continued, "I told you

special in a older car.  Once they pull on that shit they going to rip that shit out.

They don't give a fuck.  It's a $3,000 car.....I don't even know how to fucking tell

them this shit" [KING had told CS4 to repair the hidden compartment because

the trapped vehicle was so old that it was very easy for the police to find the trap.

KING reiterated his concern about telling his Mexican source of supply about the

loss of the narcotics proceeds by CS5 in Kentucky].  CS4 stated, "I didn't know

how to tell you.....Man, this is all my fault, man.  I know I fucked up." and KING

replied, "Dude, all I did tell you that?  Fucking listen to me.  We be doing this shit

too long . . . ."  CS4 agreed and stated, "I know.  That's why I can't even believe

[CS5] got pulled the fuck over, man.  [CS5] ain't never get pulled the fuck over."

    (c)     Later in the call, KING stated, "Man, oh, man, oh, man.  I'm like.

'Dude, you can see right in there.' Should have.....fucking leave at night"[ KING knew the hidden compartment was visible and that CS5 should have been traveling at night when it would be harder for the police to see the trap]. CS4 agreed, "I wanted [CS5] to leave earlier. [CS5] should have left earlier for real." KING replied, "Yeah. But the fucking construction.....Even fucking Louisville. This is fucked up. Now [CS5]'s fucking name is hot. I don't know what you're going to do to pay your bills. There ain't no fucking work" [KING was worried that CS5's name was now known to law enforcement and that he did not have access to more narcotics so he had no idea how CS4 could make up the $120,000 that CS4 owed KING and his Mexican source of supply]. CS4 stated, "Man, what do you think I'm thinking? I'm fucked, man.....I know I'm fucked. Just when I thought I was going to be alright."

(d)     Later in the call, KING stated, "I just asked you to fucking listen to me.....You didn't want the fucking car.....I don't even know when the fuck it is going to be ready now.....We going to owe for like three fucking years" [meaning that KING tried to get CS4 to use a newer trapped vehicle but CS4 had refused to get one and now CS4 and KING were going to be indebted to KING's Mexican source of supply for three years trying to pay off their drug debts]. KING then stated, "He don't call on this phone" and CS4 stated, "No. I had just went and

bought brand new phones for us" [CS4 had acquired new telephones for CS4 and CS5 so that KING would not get in trouble].

102.    Later that same day (June 9, 2008), at approximately 3:30 p.m., KING called CS4 again. During this recorded call, KING said:

(a)    "Dude said can you go and buy a car"[ KING's Mexican source of supply wanted CS4 to acquire a new vehicle). CS4 stated, "I could try.....What is he saying?  Get another car?" and KING replied, "Yeah.  He said he got someone that can get it done.....But just he don't have the fucking money to fucking buy it now" [ KING's Mexican source of supply wanted CS4 to get a new vehicle and that the source of supply had an associate of the DTO who could install a hidden compartment in the new car, but CS4 would have to pay for it].

(b)    CS4 stated, "I mean.....He ain't mad at me?  So give me another chance, hell yeah" [CS4 was willing to get another vehicle if it meant that the Mexican source of supply was not angry and would give CS4 another chance to continue trafficking narcotics]. KING stated, "I mean, he ain't mad.....He get calls like that all the fucking time, but I mean he trying to figure out if it is more than what it is, you know what I'm saying?" [KING's Mexican source of supply recognizes that seizures by law enforcement happen often, but he is trying to figure out if there is someone in the DTO cooperating with law enforcement which resulted in the seizure of the narcotics proceeds]. CS4 stated, "Yeah, [CS5

was] speeding" and KING asked, "You think that's the only reason?" [KING was asking if CS5 was really caught speeding or if CS4 thought that CS5 might be cooperating with law enforcement]. CS4 answered, "Yeah, that's the only reason. In Shelbyville" and KING agreed, "That's like right by the 'Vile too" [they agreed that speeding in Shelbyville, which is near Louisville is likely the only reason CS5 was caught].

(c)    Later in the call, KING stated, "They always doing construction right there.....[CS5] can't be doing that.....Even [if CS5] have the shit sitting on [CS5's] lap [CS5] still can't be doing that. [CS5] can't be doing what the fuck [CS5] want to do. Why the fuck can't [CS5] wait 'til [CS5] get on the other side where it's all country and [CS5] can did a fucking hundred.....I can't keep getting these motherfucking calls and then expect.....them to be, 'OK, no problem.' In a minute they going to say I'm fucking done. That's why I want you, just do what the fuck I ask you to do" [KING is warning CS4 and CS5 to listen to him because otherwise his Mexican source of supply will stop conducting narcotics transactions with him]. CS4 agreed and said, "I know, man, I know. I can't say shit. You're right" and KING continued, "You know what I'm saying.....I be seeing this shit in my motherfucking dreams, dude. And let.....the fucking smoke [die] down and lets concentrate. Ain't no need to motherfucking celebrate right now. I'm like fucking five-fifty and not even counting motorcycle man" [KING

owes his Mexican source of supply $550,000 in narcotics proceeds, which does not include other narcotics seized by the police, so he wants CS4 and CS5 to concentrate on successful drug dealing and listen to KING'S instructions]. KING continued, "The only thing that didn't get fucking messed up was the thing, the thing I didn't want to fucking do and that was fucking Rod" [KING was still conducting narcotics transactions with MCKA]).

(d)    Later in the call, KING stated, "Dude, I told you it's fucked up over there. They don't even know. That's what I was trying to tell you. That's why I wasn't even tripping and calling you everyday like, 'What you doing? Hurry up.' Have you noticed that?" [KING'S Mexican source of supply did not apply much pressure to him, which is why he didn't apply much pressure to CS4]. KING asked, "Who you going to get to fucking go now?" and CS4 stated, "Hell if I know, man." KING replied, "You better figure it out" [ KING was telling CS4 that CS4 needed to find another narcotics trafficker to replace CS5 and transport narcotics and narcotics proceeds between Chicago and Lexington on behalf of the DTO].

103.   During yet another call later that day (June 9, 2008), KING told CS4, "They going to fuck with [CS5] too.....They going to fuck with [CS5] " and CS4 asked, "You think so?" [meaning that KING'S Mexican source of supply was angry with CS5 for losing the money and they were going to hurt him because they thought he was either cooperating with the police or he stole the narcotics

proceeds]. KING asked, "Did [CS5] sign a receipt for it?" and CS4 replied, "Yeah.

Nah. [CS5] said it wasn't [CS5's] .....[CS5] said something about they want [CS5]

some receipt but [CS5] said, 'Why would I sign a receipt? It's not mine.' I said

they gave [CS5] a receipt for the money or whatever" [CS5 would not sign for the

money that was seized because CS5 had denied ownership of it, but that CS5 still

got some type of receipt from the police because they took money from the car

CS5 was driving].

## V.　Additional Narcotics Related Calls Between Members of the King DTO.

### 1.　Recorded Calls Between CS4 and KING.

104.　On February 28, 2008, CS4 received a consenusually-recorded call

from KING. During the call, CS4 stated, "I need some money, you can get the

pussy right that's the farthest thing from my mother fucking mind." KING

replied, "Let me call, I'm going to call Rod (MCKAY) to see if we can go up there

and holler at dude (selling narcotics to MCKAY's cousin in Milwaukee, WI)." CS4

stated, "Thank you." CS4 then stated, "What tomorrow?" KING stated, "We going

to (UI) tonight, so I'll holler at him see when (UI). I'll doubt we go up there

tomorrow but whenever we go we got to go fucking early you know what I'm

saying." CS4 stated, "Right." KING said, "Because it is two hours there, two

hours back and then fuck around we going to be talking shit, I got to make sure

(UI)." KING later stated, "Rod (MCKAY) be, (UI) so dead, he be like ah man I

forgot I got to call Live and them. I be like nigger all I think about is how I make my next mother fucking dollar." CS4 later stated, "He's content." KING stated, "Nigger you was in that same content position. He like I ain't got to do shit, I ain't got talk to nobody, all I have to speak to is one dude (CS4 only had to deal with KING)." CS4 stated, "I was living the life boy. That's (UI) like I'm not hustling no more." KING stated, "You got to spread your mother fucking wings, (UI) if you ever get right. That's why you like, just fuck with me, that's all you got to do is fuck with me. I'm like that sounds good, but it just ain't feasible for me." CS4 replied, "It was for a long time."

105.   During the same conversation, CS4 asked KING, "They ain't never find that van [Individual A] got car jacked in?" KING said, "Naw, they ain't heard nothing. He probably did something stupid man, I don't know what the fuck he did. Man I lost so much money on the fucking road (KING lost narcotics proceeds that has been seized by the police while they were being transported back to KING)." CS4 stated, "He ain't, he ain't do not steal that money because he ass never came up with no $150,000 dollars." KING stated, "Naw he ain't do that."

106.   On March 5, 2008, sometime shortly after 9:47 a.m., CS4 received an incoming call from KING. CS4 recorded the call. During the call:

(a)   CS4 told KING, "I'm about to head to that car lot and down to the airport." KING stated, "You going straight to the airport?" CS4 replied, "Ah I'm

going to try to time it if I can, if I do that, cause it is damn straight, it's possible that I can catch the 11:50 flight." KING said, "Ah okay." CS4 asked, "What you doing?" KING stated, "(UI) if you talked to him (UI)." CS4 stated, "Talk to my nigger who?" KING said, "You know the cat." CS4 asked, "What I talked to who?" KING asked, "You going to keep it straight with him you ain't got to be going through his cousin and shit right?" CS4 replied, "Naw this is the dude, this is the dude with the cash." KING stated, "Right, I understand that I'm just saying." CS4 stated, "Naw, I'm dealing with that nigger....I'm dealing with the nigger who got the money." KING replied, "I just wanted to make sure it ain't all that middle man and shit." CS4 stated, "Naw me too, naw this is him." KING stated, "Maybe he can help you move some of your shit." CS4 stated, "Say that again." KING stated, "I said maybe he can help move some if you want to break them down." CS4 asked, "Maybe he can help me move what?" KING said, "Talk about (UI)." CS4 said, "Ah like break them down or something?" KING stated, "Yeah."

(b)  CS4 stated, "I don't know, I'll see." KING replied, "Might want to check it though." CS4 stated, "Right.  Yeah, you know I'm going to check into everything. I like this better, I talked to him again, he's cool I'm just letting him know said I would be there tomorrow whatever, and I am going to call him here in a little bit." KING stated, "(UI) mother fucker is good though." CS4 stated, "Say that again." KING said, "Said if everything look good down there, get as

many mother fucking loads as we can" [Indicating CS4 would obtain wholesale quantities of cocaine from KING and subsequently sell them to a narcotics customer out of state]. CS4 stated, "Yeah I know. You think they put one in my pickup." KING stated, "Ah probably (UI) and shit." CS4 said, "Right I am going to be driving it down and so if they wanted to ah, to hold the money." KING stated, "Right." CS4 said, "Cause the way, the way he did your sea [installed a trap] that's pretty live, it's just a money spot in it." KING stated, "Yeah. Or what you can drive now, he said I can get like 3 or 4 on each side." CS4 stated, "Yeah. Yeah see that would be cool because you know I ain't going to be, if I am going to be doing Louisville it be like that, if it hold 3 or 4 then maybe I'll take them down there." CS4 later stated, "Alright, I'm out of here, I'm sure they open at 10." KING stated, "I got to go up there too, because I have to drop the red car off." CS4 stated, "Ah you got to take it up there?" KING stated, "Yeah, that's the only way you know what I'm saying." CS4 replied, "I thought the white boy is going to do it." KING asked, "Who?" CS4 stated, "Where we went the other night." KING stated, "Naw, that was the deal, dude can do it but, I just wanted him to look at it he be trying to scam me, they can be like, okay (UI) the reason he told me to get it cause I did one before." CS4 and KING later agreed to meet at the car lot.[22]

---

[22]   DEA Agents observed KING, MCKAY and CS4 on March 3 and March 5, 2008, obtaining a Suzuki XL7 and a Chevy HHR. During numerous recorded conversations, including the recorded meeting on March 5, 2008, KING and CS4 discuss KING's Mexican sources of supply installing traps in these two vehicles.

## 2.   Recorded Call Between CS4 and KING Regarding KING Supplying MCKAY with Wholesale Quantities of Heroin and Cocaine.

107.   On  February 28, 2008, CS4 received a consensually-recorded call

from KING. During the call KING stated, "You know like you make five, ten

thousand a week or every two weeks (UI)  you make twenty thousand a month

though, you know what I'm saying, that's the money (UI) that you ain't got to

come out of your pocket with." CS4 stated, "That's what I'm saying I can work

those areas and we [CS4 and MCKAY] can split that ten and ten." KING replied,

"But I mean, it wasn't really, it wasn't really, these niggers is iffy you know what

I'm saying." CS4 stated, "Ah I don't want to deal with that.  I don't want to fuck

with no iffy." KING stated, "They really coming cause we the only ones around

that is consistent [KING and MCKAY always have a supply of narcotics].  CS4

asked, "What about Chris's dude didn't you say Sconnie fuck with him?" KING

said, "Huh?" CS4 stated, "Sconnie got his own Mexican, he ain't that consistent?"

KING replied, "No it ain't that, they got other people they just might not be

around at that time. KING later stated, "I'm giving Rod [MCKAY] a chance so."

KING later stated, "Yeah with the other thing he might see a mother fucker once

a week, once every two weeks [MCKAY distributes wholesale quantities of

heroin and only has to see customers once a week or every two weeks], with this

he got to run every other day, you know what I'm saying, he got to be ready out

west, you know what I'm saying, he ain't you know what I'm saying, not used to

have to do all that [when MCKAY sells wholesale quantities of cocaine he has to

see his narcotics customers every other day]." CS4 stated, "He needs a helper, he

needs an assistant,...." KING stated, "You don't want to get, fuck around with

that westside. I don't even like going over there, not on no dirty shit." CS4 said,

"He got a car though. He drive that Monte Carlo [a known vehicle with a

concealed compartment in it]. KING said, "Yeah he got that." CS4 stated, "It fit

the profile though." KING stated, "Yeah you know everything is hood over there

though. As long as it ain't got no big dumb ass rims that's cool." CS4 stated, "He

better off getting a hoopde with a spot [concealed compartment] in it, you say old

dude do old cars [install concealed compartments in older model vehicles]." KING

stated, "Yeah, he do some ah, he say he can do the Taurus real good with the back

seat." CS4 stated, "Ah really." KING stated, "Yeah like the one Twin was driving,

you ever see the one he had." CS4 stated, "Who?" KING said, "Twin." CS4 later

asked KING, "How many does it hold [how many kilograms of cocaine can the

concealed compartment hold in the Taurus]?" KING replied, "I don't know

probable like the same as the Intrepid did." CS4 stated, "You had 25 in the

Intrepid." KING stated, "24 at one time." CS4 said, "25, when you first came

down, you came down with 25 [when KING first transported cocaine to CS4 in

Kentucky he had 25 kilograms of cocaine with him]." KING replied, "Right, yeah,

but I (UI) them up, well yeah it do, it did, because I used, when he gave it to me,

that's what it had, I mean he put it in there so, yeah it did do that.  CS4 stated,

"Shit I can just buy one of them."


## VII.  PROBABLE CAUSE IN SUPPORT OF SEARCH WARRANTS

### A.    Probable Cause in Support of Search Warrants Regarding the KING DTO.

108.  Based upon my training, experience, and participation in drug offense investigations as well as the financial implications which result from violations of narcotic laws, I know that those involved in drug trafficking maintain the following items at their residences and/or locations where they conduct drug business:

a.    Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, heat-sealing devices, and dilutants;

b.    Pagers, cellular phones, caller identification, and other communication devices;

c.    Books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the distribution of controlled substances;

d.    Personal books and papers and cellular telephones reflecting names, nicknames, addresses, telephone numbers, and other contact or identification data relating to distribution of controlled substances;

e.    Cash, currency, financial instruments, and records relating to controlled substances income and expenditures of proceeds of

drug- transactions, and evidence of financial transactions relating to obtaining, transferring, secreting, or spending of large sums of money made from engaging, in drug trafficking activities;

f.      Photographs and videotapes of individuals, associates, their property and their drugs;

g.      Records reflecting names, nicknames, addresses, and telephone numbers of both their current and past drug associates.

109.   In addition, during the course past residential searches of drug traffickers, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.   Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents and keys.

175.   The following is submitted in support of  warrants to search the residences at: (a) 175 Willow Boulevard, Willow Springs, Illinois; (b) 33 West Ontario, Condominium 42EN, Chicago, Illinois, c) 924 East Hyde Park Boulevard Unit 2W, Chicago, Illinois, where there is probable cause to believe that there will be evidence of Title 21, United States Code, Section 846.

110.   As described earlier in this complaint, there is probable cause to believe that KING is a wholesale supplier of cocaine and heroin with customers in the Kentucky and Chicago areas; and that KING stores narcotic proceeds and

records of his narcotic trafficking at his residences located at 175 Willow Boulevard, Willow Springs, Illinois and attached garage; and 33 West Ontario, Condominium 42EN, Chicago, Illinois.

### a.    175 Willow Boulevard, Willow Springs, Illinois

111.    As noted above, CS4 related that at an unknown date in 2007, KING purchased a town home in Willow Springs, Illinois. CS4 related that the address is 175 Willow Boulevard, Willow Springs, Illinois. CS4 related that this is KING'S primary residence. CS4 related shortly after KING moved into the town home at 175 Willow Boulevard, Willow Springs, CS4 was inside the residence. CS4 related while inside the town home, he/she saw Individual L there working in the basement. At this time, CS4 related Individual L showed CS4 a concealed compartment that he had just finished putting in the wall of the basement. CS4 related that he/she observed Individual L finish the drywall around the safe.[23]

112.    On February 24, 2008, agents went to the 175 Willow Boulevard, Willow Springs, Illinois, and took photos of the front and rear of the residence. While taking photos of the residence, agents observed three (3) mail receptacles just to the east of the garage attached to 175 Willow Boulevard. Each of the three mail box receptacles were labeled with black and white stickers that each read the physical locations relating to the residence to which the mail box receptacle belonged. One of the receptacles read "175." Two of the three

---

[23] Individual L is the same individual that installed the "wall safe"for CD3 in which an approximately $589,920 in narcotics proceeds was seized from.

receptacles were open, including the one that read "175." Agents observed pieces of mail in plain view of the mail box receptacle "175." Agents observed the top piece of mail inside of the mail box receptacle "175" contained the name of "Michael King."

113.  On February 27, 2008, at approximately 5:00 p.m., agents conducted surveillance of 175 Willow Boulevard, Willow Springs, Illinois. At approximately 5:05 p.m., agents observed CS4 walk up to a Cadillac Escalade bearing Illinois Plate 973-2342, and begin to talk to KING, who was sitting in the drivers seat of the Cadillac.[24]  The Cadillac was parked in front of 175 Willow Boulevard. Agents observed CS4 talking to KING through the drivers side window of the Cadillac.

114.  At 5:07 p.m., agents observed CS4 walk away from the Cadillac Escalade and return to his/her vehicle. Shortly thereafter, agents observed KING drive away from 175 Willow Boulevard, followed by CS4.

115.  On February 28, 2008, at approximately 11:00 a.m., agents debriefed CS4.  During the debriefing, CS4 related that on February 27, 2008, at approximately 5:00 p.m., he/she went over to KING's residence located at 175 Willow Boulevard, Willow Springs', Illinois.  CS4 related upon his/her arrival, KING was sitting inside his black Cadillac Escalade, which was parked on the

---

[24] As of June 2008, Illinois license plate 973-2342 is registered to Michael KING at 175 Willow Boulevard, Willow Springs, Illinois.  Furthermore, Illinois license plate 975-5496 is registered to Michael KING at 175 Willow, Willow Springs, Illinois.

street directly in front of the residence. CS4 related that he/she proceeded to engage in a conversation with KING.

116.   CS4 related during the conversation with KING, KING told CS4 that he was taking the Escalade to the "trap guy." CS4 related KING told him/her that he was going to have a trap installed in the Escalade.[25] CS4 related he/she tried to go with KING, but KING told CS4 to go to the car dealership. CS4 related KING wanted CS4 to trade in his/her vehicle to obtain a Sports Utility Vehicle, so KING could have a large trap installed in it. CS4 related at this time they both departed the area.

117.   CS4 related that between 9:00p.m. and 9:30p.m., he/she went back to KING's residence, 175 Willow Boulevard, Willow Springs, Illinois. CS4 related that he inquired about KING's ADT Alarm in his house. CS4 related KING told him/her that the alarm would call his cell phone if it was activated.

118.   CS4 related while he/she was inside KING's house, he/she had an opportunity to take photographs with his/her cell phone. CS4 proceeded to take photographs of KING in his residence, the alarm system and of the location of the concealed compartment in the wall where CS4 related KING keeps a majority of his narcotics proceeds.

119.   On April 15, 2008, agents again debriefed CS4 regarding KING. CS4 related on April 9, 2008, he/she contacted KING via cell phone. During the call

---

[25]On this basis, your Affiant believes probable cause exists to seize KING's Escalade.

[which was recorded], KING advised CS4 that he picked up the Mountaineer and that he thought the police followed him. Furthermore, KING stated he abandon the vehicle and got a ride back to his residence at 175 Willow Boulevard, Willow Springs, Illinois. KING asked CS4 to come over to his residence so they could go and retrieve the Mountaineer.

120. CS4 related on April 10, 2008, at approximately 1:00 a.m., CS4 went to 175 Willow Boulevard, Willow Springs, Illinois. CS4 related shortly after he/she arrived, they went and retrieved the Mountaineer.

121. On June 22, 2008, at approximately 10:00 p.m., CS4 placed a consensual recorded call to KING. During the call, CS4 asked, "You be staying back out in the suburbs?" KING stated, "No I've been downtown." CS4 later asked, "You still ain't talk to Slow Poke [KING's Mexican source of supply]." KING stated, "Nah that mother fucker ain't call me back." CS4 later stated, "I just making sure he ain't cut us off [meaning stop suppling narcotics to KING and CS4]." KING replied, "Na shit I ain't tripping. I know (UI) fucken money." CS4 asked, "What did you say?" KING stated, "I said he want his fucken money [meaning KING's source of supply wants the narcotics proceeds owed to him that was lost by KING and CS4, partly as a result of some police seizures]." CS4 later asked, "When you going to go back out to Willow Springs?" KING replied, "I'm already there, why?" CS4 asked, "I thought you were just staying downtown?" KING stated, "Na I was down there." CS4 stated, "Oh." KING stated, "I came (UI)

ten days you know. I'm going to buy me some mother fucken patio furniture." CS4 asked, "Patio furniture for your house?" KING stated, "Hell yeah, man sit out there like them white people (UI)...fuck you know...(UI)." KING later stated, "Get me a T.V. out there, 20 inch." CS4 asked, "On the deck of your townhouse?" KING stated, "Yeah (UI)." CS4 said, "It's little as fuck." KING stated, "Man that townhouse, that mother fucker cover the whole yard." CS4 asked, "The deck?" KING stated, "Yeah, it goes from the end of the patio all the way to the end of the fucken..." CS4 stated, "All yeah it is a big ass deck." KING stated, "It is fucken roomy..." CS4 stated, "Yeah I forgot." KING stated, "I can get five, six people in there real comfortable."

### b.   33 West Ontario, Condominium 42EN, Chicago, Illinois.

122.   On February 29, 2008, at approximately 12:30 p.m., agents debriefed CS4. CS4 related that on February 28, 2008, at approximately 9:00 p.m., he/she met with KING at Ruth's Chris Steakhouse in Chicago. CS4 related at this time, he/she proceeded to meet KING and Individual T. CS4 related while eating dinner, KING was trying to "recruit" Individual T to sell narcotics for him.

123.   CS4 related after dinner, King told him/her that he had to go to Rod's (Claude McKay III) place to pick up money from him. CS4 related KING advised him/her to meet him back at his condominium (33 West Ontario, #42EN, Chicago, Illinois) in about an hour.

124. CS4 related at approximately 11:45 p.m., CS4 went to KING's condominium located at, 33 West Ontario #42EN, Chicago, Illinois. CS4 related while he/she was inside the condominium, KING told him/her he had just picked up money from MCKAY. CS4 related a short time later, KING started to count the money in front of CS4. CS4 related he/she counted in his/her head as KING was counting the money. CS4 related King had picked up $15,000. CS4 subsequently took pictures of King counting the narcotic proceeds while inside 33 West Ontario #42EN, Chicago, Illinois.[26] CS4 related King proceeded to place the money in an unknown location in the back bedroom of the condominium.

125. On February 29, 2008, at approximately 1:50 p.m., MCKAY received a call, (call 2287) on Target Phone 7, from KING utilizing phone number (312) 929-2642.[27] During the call, KING asked MCKAY why he didn't answer the phone. KING further stated, "Yellow Boy trying to call you."

126. In May 18, 2008, CS4 placed a recorded call to KING. During the call, while talking about KING moving to Atlanta, CS4 asked KING what he was going to do with the place on Ontario. KING responded by stating he had paid the rent to July.

---

[26] The pictures consist of KING sitting at a desk with bundles of U.S. Currency and of KING counting the Currency.

[27] Phone number (312) 929-2642 is subscribed to Shawnese Leak at, 33 West Ontario Street, Apt. 42EN, Chicago, Illinois. Comcast is the service provider for this number. Comcast is known to only provide service for residential phones. KING's voice has previously been identified by CS1, CS4 and agents who have listed to other recorded calls involving KING.

127. On June 5, 2008, CS4 related to agents after the seizure of the narcotics that occurred on May 26 and 27, 2008, KING stayed the night at his Ontario residence.

128. Agents debriefed CS4 on June 19, 2008. During the debriefing, CS4 related he/she went over to #42EN last night (June 19, 2008). CS4 related as he/she went into the condo, he/she took a photograph of the numbers on the door. CS4 related once inside, he/she met with KING. CS4 related while inside the condo, he/she had a conversation with KING regarding "Slow Poke" KING's Mexican source of supply, used by KING and CS4]. CS4 related that during the conversation, KING told CS4 that the prices for the narcotics are going up. Furthermore, KING stated "Slow Poke" has not answered his phone in the last few days. CS4 related a short time later, Rod [MCKAY] came over. CS4 related he/she engaged in a conversation with MCKAY. CS4 related MCKAY told CS4 that they [KING and MCKAY] had to purchase their narcotics from someone else and it was not good [meaning the quality of narcotics from other sources besides "Slow Poke" was not good].

c.    **924 East Hyde Park Boulevard, Unit 2W, Chicago, Illinois.**

129. As described in detail at ¶¶ 71-79, above, on February 8, 2008, DEA agents conducted surveillance at MCKAY's residence located at 924 East Hyde Park Boulevard, Chicago, Illinois, and observed MCKAY conduct a 25 gram crack cocaine transaction.

130. As also described at ¶¶ 86-96, above, on May 26, 2008, CS4 informed agents that KING had contacted him/her and advised him/her that wholesale quantities of cocaine was ready to be picked up. During recorded calls to CS4 both MCKAY and KING advised CS4 to come to MCKAY's residence at 924 East Hyde Park Boulevard Unit 2W, Chicago, Illinois. CS4 was subsequently equipped with electronic equipment in order to monitor and record the anticipated conversation between KING, MCKAY and CS4.

131. At approximately 9:00 p.m., CS4 drove the CS vehicle towards MCKAY's residence. At approximately 9:19 p.m. agents observed CS4 arrive at 924 Hyde Park Boulevard, Chicago, Illinois. Upon arrival, CS4 went up to the second floor and into MCKAY's residence, 924 Hyde Park Boulevard Unit #2W, Chicago, Illinois. At this time, CS4 observed KING, MCKAY, and Individual T were all present. CS4 proceeded to engage in a conversation [which was recorded] with KING and the others. During the conversation, KING directed CS4 and Individual T to go and pick up wholesale quantities of cocaine from one of his Mexican sources of supply narcotics transporter. Shortly thereafter, at approximately 9:40 p.m., agents observed CS4 and Individual T exit the area of 924 East Hyde Park Boulevard, Chicago, Illinois. Agents observed CS4 enter the CS Vehicle and depart the area. Agents maintained surveillance on CS4 as he/she traveled towards 2 East 8th Street, Chicago, Illinois.

132. Following the narcotics transaction in the parking garage, described

in ¶ 8696, above, at approximately 10:16 p.m., agents observed CS4 arrive back at 924 East Hyde Park Boulevard, Chicago, Illinois. Shortly thereafter, agents observed CS4 enter the entryway for 924 East Hyde Park. At this time, CS4 engaged in a conversation [recorded] with KING and MCKAY. CS4 related that during this conversation, CS4, KING, and MCKAY conversed about material used to "step"on the cocaine. CS4 related MCKAY subsequently took out materials known to CS4 that are used to "step" on [break down] the cocaine. CS4 related he/she told MCKAY that he/she used different materials to "step"on his/her cocaine.

133.   Agents debriefed CS4 on June 20, 2008. During the debriefing, CS4 related he went over to 924 East Hyde Park Blvd the previous night. CS4 related upon his/her arrival, he went into the apartment and met with MCKAY and MCKAY's girlfriend. CS4 related he/she engaged in a conversation with MCKAY.

## V.   PROBABLE CAUSE FOR SEIZURE WARRANT OF KING'S ESCALADE

134.   As described in paragraph 116, n.25, above, CS4 related to DEA agents that King has a secret trap compartment in his 2008 Cadillac Escalade, bearing Illinois license plate 973-2342, VIN nuber 1GYFK63878R145207, and registered to KING.

135.   Based on the foregoing, there is probable cause to believe that this vehicle will be subject to forfeiture upon conviction of defendants for violations of Title 21 United States Code,   846 (conspiracy to distribute controlled

substances).

136.   In order to ensure the availability of the vehicles is preserved for forfeiture, Title 21, United States Code, Section 853(e) authorizes the entry of a restraining order or any other action necessary to preserve the property.   Title 21, United States Code, Section 853(f) states, in the same manner as provided for a search warrant, a seizure warrant may be issued when the property would, in the event of conviction, be subject to forfeiture and a restraining order may not be sufficient to assure the availability of the property for forfeiture.   The government seeks a seizure warrant under Section 853(f) because a restraining order or any other action is not sufficient to assure the availability of the subject vehicles for forfeiture.   Courts have long recognized that the unique circumstances involved in searching vehicles due to their inherent mobility. Moreover, in *Florida v. White*, 526 U.S. 559 (1999), the Supreme Court found that a warrantless seizure did not violate the Fourth Amendment where there was probable cause to believe that the automobile was subject to forfeiture because movable contraband may be "spirited away".

137.   In my experience, I know that motor vehicles are easily transferred or hidden thereby making them difficult to locate. Moreover, I am aware that the appearance of a motor vehicle can be altered or it can be concealed in a garage or storage area making it difficult, if not impossible, to find for the purpose of forfeiture proceedings. In addition, motor vehicles can be transported outside the

district further increasing the potential unavailability of these motor vehicles for forfeiture in the event of conviction. Furthermore, I know that unless a motor vehicle is seized, it can be difficult to preserve the value of the motor vehicle for forfeiture purposes because financial obligations relating to the vehicle, including insurance payments and loan obligations are not satisfied, when an owner is notified that it is likely his property will be subject to forfeiture.

FURTHER AFFIANT SAYETH NOT.

_____
Eric Durante
Special Agent
Drug Enforcement Administration

SUBSCRIBED and SWORN before me this __16th__ day of July 2008.

_____
Honorable Morton Denlow
United States Magistrate Judge
Northern District of Illinois